6 P.3d 349

Cheryl CRICHFIELD and Gary Crichfield, Plaintiffs–Appellants

v.

GRAND WAILEA COMPANY, a Domesitc Limited Partnership, Defendant–Appellee,

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.

No. 22851.

Supreme Court of Hawai'i.

July 31, 2000.

Reconsideration Denied Aug. 23, 2000.

Roy K.S. Chang and Harvey M. Demetrakopoulos, on the briefs, Honolulu, for the plaintiff-appellants Cheryl Crichfield and Gary Crichfield.

Patricia M. NaPier, Normand R. Lezy, and Tonya C. Kong, of Goodsill, Anderson, Quinn & Stifel, on the briefs, Honolulu, for the defendant-appellee Grand Wailea Company.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Circuit Court Judge NAKAMURA, Assigned By Reason of Vacancy.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Cheryl Crichfield ("Cheryl") and Gary Crichfield ("Gary") [collectively, "the Crichfields"] appeal from the second circuit court's order, filed on September 13, 1999, granting summary and final judgment against them and in favor of the defendant-appellee Grand Wailea Company ("Grand Wailea"). On appeal, the Crichfields contend that the circuit court erroneously

granted summary judgment against them and in favor of Grand Wailea, inasmuch as there was a genuine issue of material fact regarding whether the Crichfields were present on land owned by Grand Wailea for a "recreational purpose," within the meaning of the Hawai'i Recreational Use Statute (HRUS), Hawai'i Revised Statutes (HRS) chapter 520 (1993 & Supp.1997), *see infra* section III.A.

We vacate the circuit court's order and remand the matter to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

During the first week of September 1997, the Crichfields were registered guests of the Four Seasons Hotel on the island of Maui. On their last scheduled day in Hawai'i, the Crichfields were walking around the grounds of the Grand Wailea Resort, Hotel, and Spa ("the hotel"), which is located adjacent to the Four Seasons Hotel. The Crichfields left the walking path in order to get a better look at the fishpond and statuary on the hotel's grounds. While on the grass near the fishpond, Cheryl decided to remove her slippers. Lifting her left leg, she pushed her left slipper off her foot using her knee. When she placed her left foot back on the ground, she slipped and fell. In an effort to break her fall, she thrust out her right hand. Cheryl broke her arm, resulting in severe complications. The accident occurred on September 6, 1997.

On January 29, 1998, the Crichfields were interviewed by John Reitzel, a representative of Ward North America. He introduced himself to the Crichfields as an independent insurance administrator working on behalf of Grand Wailea. During her recorded interview with Reitzel, Cheryl described why she and her husband had taken a walk on the grounds of the hotel:

> We had taken a scuba diving lesson and finished and decided to walk next door to see the grounds of the Grand Wailea statuary and the pond and had walked on the sidewalk that was adjoining the Four Seasons and walked up that way.

According to Cheryl, the accident took place "[r]ight on the edge of the pond, on the beach[;] there's a very large exotic fish pond with statuary and it was right, right there." She described the accident as follows:

> We left the sidewalk, walked over toward the edge of the pond, um, I stopped to look at, to say something to my husband, I was kind of facing him. Went to take off my shoes, my sandals, because I wanted to walk on the grass. Took one sandal off, put my foot down and as I put my foot down, it felt, it was slick as glass. I started to fall. I've had four hips replaced, I've had my hips replaced four times due to advanced osteoporosis and I did not want to break a hip and I put my arm down to, break my fall. And in doing that, I broke my arm.

At the time of the accident, around 1:00 p.m., it was a "beautiful clear, clear as a bell, beautiful day."

In his recorded interview with Reitzel, Gary described the accident as follows:

> GARY: Okay, um between the Four Seasons and the Grand Wailea, um, we were staying at the Four Seasons and there's a sidewalk that connects all of the hotels along the beachfront[,] and we walked along that sidewalk towards the Grand Wailea. And like I was saying[,] between them there is a fish pond that has a, grassy area where there is lots of ah bronze sculpturing and statuary[,] and it was at this point, walking across the grass lawn, looking at the statuary and the fish pond[,] that the accident occurred.
>
> . . . .
>
> REITZEL: Okay, can you tell me how the accident happened?
>
> GARY: Well, we had been, like I mentioned[,] we'd been looking at the statuary, walking along the grass. The grass up to this point had been perfectly dry. There, and it had been firm and stable, no problems, nothing to indicate that there was a wet spot in this particular area[,] and as we walked from one statute [sic] to the next statute [sic] and we were walking around the ah, the fish pond[,] um, I walked, I was not directly

with her. I was a few feet away from her. But she bent down to take her shoes off cause she wanted to walk with her shoes off and took a step ..., put her foot down[,] and the next thing I knew she was on the ground. Um, and. . . .

REITZEL: She was a few feet from you when this happened?

GARY: Yeah, she was a few feet away[,] so I was looking at her while it happened. Then I watched her bend over and take a shoe off and, and then she put her foot down and put some weight on that foot[,] and then[,] boom, the next thing I knew she was down. As she tells me, that area was just as slick as glass and or as ice, as slippery as, as glass.

REITZEL: When you got over to her, did it seem slippery to you?

GARY: Ummm, that's a good question, I was in such shock at the time. Um, I honestly couldn't answer that. I don't know, I was very, very concerned about her because she was in a lot of pain, instantly in a lot of pain. Um[,] I noticed as soon as she went down she had her arm out, she hit the ground and I knew she did something to the arm because she immediately cradled it to her chest and said, "It's broken, I know it's broken, please get some help." So, I don't remember the area being slick or anything about the footing of the area myself. I couldn't tell you.

(Some ellipsis points added and some in original). Gary did observe, however, that the area around Cheryl had become muddy after the police and emergency people arrived and traipsed around her.

On April 10, 1998, the Crichfields were interviewed by Chris Walby, a second representative of Ward North America. Cheryl explained further why she and her husband had decided to walk around the grounds of the Grand Wailea on September 6, 1997, as follows: That morning, Cheryl had become claustrophobic during a scuba diving lesson and could not continue the lesson. Gary, however, had completed the lesson and had gone scuba diving.

CHERYL: ... When he had finished with that, he came up to the room because I was very upset that I had, that, that was the one thing I wanted to do up there[,] and I was very angry with myself for being claustrophobic and[,] ah, I had gone back up to the room[,] and he came back up to the room and got me and said let's go for a walk and you know, you can, you'll feel better after we go for a walk and talk.

. . . .

WALBY: Now, did, so you said you guys took the pathway along the beach to go over to the Grand Wailea?

CHERYL: Uh huh.

WALBY: And, ah, did you have any specific plans over there? Is there, um, were you ...

CHERYL: We wanted to, we, Gary said there was some beautiful statuary over there and they had a, a pond that, with some tropical fish in, that he wanted me to see and we just wanted to see what one of the other hotels looked like.

. . . .

WALBY: ... And did you do any shopping or anything on the property before this happened?

CHERYL: No. We just walked onto the property.

WALBY: Okay. Didn't go anywhere and have anything to drink or eat?

CHERYL: No.

(Some ellipsis points added and some in original). Cheryl also added that, just prior to taking off her slipper, the last step she took "was squishy" but that she didn't feel any actual moisture on or in her slipper. Rather, it was "a spongy muddy feeling." At the end of the interview, Walby again asked what "the purpose [was] for your going to the Grand Wailea," to which Cheryl replied: "To look at the statuary and the pond and just the different, different location, I wanted to see what another hotel would look like."

In his interview with Walby, Gary explained that he had first visited the Grand Wailea two days before the accident because he "had been told there was some beautiful

artwork, some bronze sculpturing, to view on the property." He "wandered around the grass area where these sculptures were and took pictures of them at that time with [his] camera and returned back and told [his] wife[,] 'We have to go, we have to go, you have to see this.'" In response to Walby's question, "[S]o was that the sole purpose of your returning to the Grand Wailea on the date of the accident," Gary responded, "Yes it was."

On July 22, 1998, the Crichfields filed a complaint against Grand Wailea and the Doe defendants, in which they asserted claims grounded in negligence, breach of warranty, and strict products liability. On August 27, 1998, Grand Wailea filed its answer, in which, *inter alia*, it asserted HRUS as an affirmative defense. The Crichfields filed an amended complaint on September 23, 1998, which Grand Wailea answered on October 15, 1998, again asserting HRUS as an affirmative defense. Grand Wailea filed a motion for summary judgment on all of the Crichfields's claims on June 18, 1999. In the motion, Grand Wailea argued that Cheryl's negligence claim—and, *a fortiori*, Gary's derivative claim—were barred by HRUS and that the breach of warranty and strict products liability claims were not supported by Hawai'i law.

Although the Crichfields did not oppose summary judgment on their breach of warranty and products liability claims, they did urge that HRUS did not bar their negligence claim. The Crichfields argued that, inasmuch as they were now averring by way of

affidavits that their reason for visiting the Grand Wailea was to have lunch at the resort and that their purposes and actions while on the grounds of the Grand Wailea were therefore not "recreational," there remained a genuine issue of material fact that precluded summary judgment.

The affidavits upon which the Crichfields relied at the hearing on Grand Wailea's motion for summary judgment had not been signed at the time the hearing was conducted.[1] Copies of the unexecuted affidavits were attached to the Crichfields' memorandum in opposition, and the Crichfields' counsel explained in a declaration, also attached to the memorandum, that he had not yet received the executed affidavits back from the mainland. At the hearing on Grand Wailea's motion, conducted on July 22, 1999, the circuit court inquired of the Crichfields' counsel, "How do you expect [the court] to rely on the unsigned affidavits?" The Crichfields' counsel replied that the court had the discretion to hear argument and defer making a decision until the signed affidavits could be filed. The circuit court then requested that the parties proceed with oral argument on Grand Wailea's motion for summary judgment.

Grand Wailea argued that the affidavits, even if they were admissible as evidence, did not generate a genuine issue of material fact because "[t]his whole idea of lunch never came up until it was asserted in these affidavits in response to our motion for summary judgment" and, therefore, the factual allegations contained in the affidavits were nothing

---

1. Cheryl and Gary ultimately executed separate affidavits on July 26, 1999, both of which, in substance, were identical. Cheryl's affidavit averred in relevant part as follows:

 [] On September 6, 1997, my husband suggested that we eat lunch at one of the restaurants at the Grand Wailea, which was next door to our hotel, the Four Seasons. We had already eaten at the various establishments at the Four Seasons, and had even asked a Four Seasons employee what other restaurants there were to eat at in the area. The employee suggested the Grand Wailea.
 [] We decided to go to the Grand Wailea to purchase and eat lunch, and on the way to look at the statues my husband had seen earlier. We were on our way to the main building complex of the Grand Wailea when the acci-

 dent happened. If you face the Grand Wailea from the beach, with your back to the ocean, the Four Seasons is on the right, the area where the accident happened directly in front of you, and the main building complex is to your left.
 [] No one ever asked me where we were going to eat lunch that day. If they had I would have told them. Our visit was for the purpose of patronizing their business establishment. We were not going there for any recreational purpose, such as hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, or viewing or enjoying historical, archeological, scenic, or scientific sites.
 Gary's affidavit contains the same three factual paragraphs, substituting "I" for "my husband."

more than "an attempt to retroactively mold their testimony to try to take them out of [HRUS]."

In the alternative, Grand Wailea argued that, even if the Crichfields actually subjectively intended, when entering Grand Wailea's property, to purchase lunch, HRUS still applied because *"Howard v. United States* [, 181 F.3d 1064, 1072–73 (9th Cir.1999),] says you look at the landowner's intent for opening up the property, not Plaintiff's subjective intent and purpose for being on the property." Grand Wailea reasoned that, inasmuch as it is the landowner's intent that controls whether the landowner comes within or without the statute, the subjective intent of the plaintiff is immaterial. Because the Crichfields did not contest the declaration of the Grand Wailea's executive director of finance, which stated in part that the portion of the grounds on which the accident had occurred was held open to the public for recreational purposes such as walking and viewing the scenic sites, Grand Wailea contended that there was no genuine issue of material fact, that Grand Wailea came within HRUS, and that HRUS immunized Grand Wailea from negligence liability for the accident.

In response, the Crichfields argued that the purpose of Grand Wailea's facilities and grounds was to commercially "operate a hotel and restaurant for people to patronize, and that is what [the Crichfields] were going to do." In addition, the Crichfields argued that Ward North America's interviewers had deliberately avoided asking the Crichfields if they were on the property of Grand Wailea to have lunch.

After noting that the accident had occurred on September 6, 1997, the circuit court ruled as follows:

> ... In January of 1998, the recorded statements were taken. There is no question in the Court's mind about what they were there for, which was to view the statues; in other words, what the Court is concluding is that they come specifically within the statute.
>
> As to the affidavits, up to now they have not been signed, but even if they were signed, there is no question that today is already July of 1999. If it could be argued

that somebody—I know that you made in your argument that during the recorded statement there was some avoidance asking the question about lunch.

> The Court is not convinced about that because I read the recorded statements. It appears clear to the Court that there was no trickery, and the reason I mention that is you are now trying to say there is a question of fact in this case concerning the lunch to which your clients are about or will execute affidavits. It probably could be argued at this point they are the ones who are trying to create an issue of fact.
>
> From what has been presented to me and considering the statute involved in this case, the Court is going to—as a matter of law, the Court is going to grant the Defendant's motion for summary judgment.

The Crichfields' affidavits were signed and notarized on July 26, 1999, and were filed on August 2, 1999. The circuit court filed its order granting summary and final judgment in favor of Grand Wailea and against the Crichfields on September 13, 1999. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

### A. *Summary Judgment*

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of estab-

lishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*Taylor v. Government Employees Ins. Co.*, 90 Hawai'i 302, 305–06, 978 P.2d 740, 743–44 (1999) (quoting *State Farm Mut. Auto. Ins. Co. v. Murata*, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997))) (brackets in original).

B. *Statutory Interpretation*

 "[T]he interpretation of a statute ... is a question of law reviewable de novo." ... *Arceo*, 84 Hawai'i [at] 10, 928 P.2d [at] 852 ... (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930 ... (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704 ... (1994)....

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting ... *Toyomura*, 80 Hawai'i [at] 18–19, 904 P.2d [at] 903–04 ... ) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (quoting *State v. Dudoit*, 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker*, 90 Hawai'i 85, 90–91, 976 P.2d 399, 404–05 (1999)[ ] (quoting *Ho v. Leftwich*, 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998))))) (some ellipsis points and brackets added and some in original).

### III. DISCUSSION

A. *The Hawai'i Recreational Use Statute*

HRUS was first enacted in 1969. *See* 1969 Haw. Sess. L. Act 186, at 333–35. It subse-

quently has been amended twice, once in 1996, *see* 1996 Haw. Sess. L. Act 151, at 328–29, and again in 1997, *see* 1997 Haw. Sess. L. Act 272, at 603–04, and 1997 Haw. Sess. L. Act 380, § 9 at 1193, 1205–06. The statutorily declared purpose of HRUS is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." HRS § 520–1 (1993).

HRUS defines a number of key terms:

"Charge" means the admission price or fee asked in return for invitation or permission to enter or go upon the land.

"House guest" means any person specifically invited by the owner or a member of the owner's household to visit at the owner's home whether for dinner, or to a party, for conversation or any other similar purposes including for recreation, and includes playmates of the owner's minor children.

"Land" means land, roads, water, water courses, private ways and buildings, structures, and machinery or equipment when attached to realty, other than lands owned by the government.

"Owner" means the possessor of a fee interest, a tenant, lessee, occupant, or person in control of the premises.

"Recreational purpose" includes but is not limited to any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites.

"Recreational user" means any person who is on or about the premises that the owner of land either directly [or] indirectly invites or permits, without charge, entry onto the property for recreational purposes.

HRS § 520–2 (brackets in original) (1993 & Supp.1997).

The heart of HRUS immunizes an owner of land from liability to any person who enters or uses the owner's land for recreational purposes:

Except as specifically recognized or provided in section 520–6, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes, or to persons entering for a purpose in response to a recreational user who requires assistance, either direct or indirect, including but not limited to rescue, medical care, or other form of assistance.

HRS § 520–3 (1993 & Supp.1997). Section 520–6 provides that:

Nothing in this chapter shall be construed to:

(1) Create a duty of care or ground of liability for injury to persons or property.

(2) Relieve any person using the land of another for recreational purposes from any obligation which the person may have in the absence of this chapter to exercise care in the person's use of such land and in the person's activities thereon, or from the legal consequences of failure to employ such care.

HRS § 520–6 (1993). HRUS also provides that:

(a) Except as specifically recognized by or provided in section 520–6, an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not:

(1) Extend any assurance that the premises are safe for any purpose;

(2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;

(3) Assume responsibility for, or incur liability for, any injury to person or property caused by an act of omission or commission of such persons; and

(4) Assume responsibility for, or incur liability for, any injury to person or persons who enter the premises in response to an injured recreational user.

(b) An owner of land who is required or compelled to provide access or parking for such access through or across the owner's property because of state or county land use, zoning, or planning law, ordinance, rule, ruling, or order, to reach property used for recreation purposes, or as part of a habitat conservation plan, or safe harbor agreement, shall be afforded the same protection as to such access, including parking for such access, as an owner of land who invites or permits any person to use that owner's property for recreational purposes under subsection (a).

HRS § 520–4 (1993 & Supp.1996 & Supp. 1997).

The immunity conferred by HRUS upon a landowner does not, however, extend to three sets of circumstances.

Nothing in this chapter limits in any way any liability which otherwise exists:

(1) For wilful or malicious failure to guard or warn against a dangerous condition, use, or structure which the owner knowingly creates or perpetuates and for wilful or malicious failure to guard or warn against a dangerous activity which the owner knowingly pursues or perpetuates.

(2) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that in the case of land leased to the State or a political subdivision thereof, any consideration received by the owner for such lease shall not be deemed a charge within the meaning of this section.

(3) For injuries suffered by a house guest while on the owner's premises, even though the injuries were in-

curred by the house guest while engaged in one or more of the activities designated in section 520–2(3)[, *i.e.,* "recreational purposes"].

HRS § 520–5 (1993).

In summary, HRUS confers upon the "owner" of land immunity from negligence liability to any person—who is neither "charged" for the right to be present nor a "house guest"—injured on the land while that person is using the owner's land for a "recreational purpose." In other words, if a person is injured on an "owner's" land, but that person was not on the land for a "recreational purpose," HRUS does not, by its plain language, immunize the "owner" from tort liability. Moreover, pursuant to HRS § 520–5, an "owner" is not immune from tort liability, if: (1) the injury results from the owner's wilful or malicious failure to guard against or warn of either a dangerous condition, use, or structure that the owner knowingly created or perpetuated, or a dangerous activity that the owner knowingly pursued or perpetuated; (2) the owner "charged" the recreational user a fee or price of admission for the use of the land; or (3) the injury was suffered by a "house guest."

### B. *Judicial Interpretation of HRUS*

Although HRUS has been in effect for over thirty years, this court has never directly addressed the statute.[2] The Intermediate Court of Appeals (ICA), however, recently reviewed HRUS in *Atahan v. Muramoto,* 91 Hawai'i 345, 984 P.2d 104 (App.), *cert. dismissed,* 91 Hawai'i 345, 984 P.2d 104 (1999), but the questions of what constituted a "recreational purpose" or whether the statute afforded a general affirmative defense to commercial property owners were not considered as such.[3]

---

**2.** In *In re Application of Banning,* 73 Haw. 297, 307, 832 P.2d 724, 730 (1992), we tangentially considered aspects of HRUS immaterial to the present analysis. *See also Geremia v. State,* 58 Haw. 502, 505 n. 3, 573 P.2d 107, 110 n. 3 (1977).

**3.** In *Atahan,* the ICA addressed the question whether a defendant-landowner who permitted the plaintiffs to park on his land could assert HRUS immunity where one of the plaintiffs was injured, not on the defendant-landowner's land,

but in the ocean fronting a neighboring lot, two lots down from where the plaintiff had parked. *Atahan,* 91 Hawai'i at 347–48, 984 P.2d at 106–107. In other words, the plaintiffs had used the defendant-landowner's land for parking, walked across the land, and one of them was injured somewhere else. The ICA, over a dissenting opinion, held that HRUS did immunize the defendant-landowner and concluded that the statute "abolished any duty to prevent or to warn that [the defendant-landowner] may otherwise

On the other hand, a number of federal decisions have construed HRUS. *See Howard v. United States,* 181 F.3d 1064 (9th Cir. 1999); *Palmer v. United States,* 945 F.2d 1134 (9th Cir.1991); *Budde v. United States,* 797 F.Supp. 731 (N.D.Iowa 1991); *Stout v. United States,* 696 F.Supp. 538 (D.Haw. 1987); *Viess v. Sea Enterprises Corp.,* 634 F.Supp. 226 (D.Haw.1986). Grand Wailea urges us to follow the holding and reasoning of *Howard.*

In *Howard,* the plaintiff, who was the wife of a military officer on active duty, was injured on a floating dock. At the time of the injury, she had just completed a privately conducted class in sailing at the Hickam Harbor Recreational Facility ("Hickham Harbor"), which was located at the Hickam Air Force Base and was maintained by the military. She was gathering a sail when an incoming swell caused the floating dock to move unexpectedly. As a result, the gangway rolled onto her foot. *See Howard,* 181 F.3d at 1065–66. She sued the United States, which asserted HRUS as an affirmative defense. *Id.* at 1066.

The plaintiff argued, *inter alia,* that: (1) HRUS did not apply because she was a business invitee; and (2) she was not engaged in a "recreational" activity at the time of the injury, but, rather, had taken the boating class for a "professional" purpose in order to learn how to become a sailing instructor. The United States Court of Appeals for the Ninth Circuit refused to read a "business invitee" exception into HRUS and held:

> The language of the HRUS is unambiguous and clearly extends immunity to any landowner who allows "any person" to enter onto his or her land "without charge" for "recreational purposes." [HRS] § 520–4. The only exceptions to this grant of immunity are also stated in unambiguous terms: (1) where injury is caused by the landowner's willful or malicious acts or omissions; (2) where the landowner "charges" the person to enter or go on the land; and (3) where the injured party is a "house guest." [HRS] § 520–5. There is, therefore, no need to resort to the legislative history of the HRUS in search of an exception that is clearly not included. *See United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997).

*Howard,* 181 F.3d at 1072.

With regard to the plaintiff's argument that she was engaged in a professional—rather than a recreational—purpose, the Ninth Circuit held that the plaintiff's professional motivation for enrolling in the sailing course was "not relevant." *Howard,* 181 F.3d at 1073. The Ninth Circuit reasoned:

> Holding that it is the landowner's intent that controls whether the recreational use statute applies in this situation furthers the purpose of the HRUS of encouraging landowners to make land and water areas available to the public for recreational purposes. *See* [HRS] § 520–1. As the Government points out: "If land owners were required to screen each individual entering their property to ensure that each and every person had a proper recreational purpose so that the HRUS applied, then landowners would not open their property at all, defeating the purpose of the statute."
>
> In summary, although Howard may have had professional as well as personal reasons for taking the course, her alleged "professional" motivation does not convert her into a "nonrecreational" user. Her subjective intent is, in this situation, immaterial.

*Howard,* 181 F.3d at 1073 (footnote omitted).

Were we to apply the *Howard* rule and hold that a plaintiff's subjective intent is immaterial to whether HRUS applies to immunize a landowner, then the Crichfields'

have owed to the [plaintiffs] with respect to their use of [the defendant-landowner's land] as a place to park their car, access the public beach fronting [the defendant-landowner's land], [his neighbor's land], and [the park neighboring his neighbor's land], and access and use the ocean fronting the beach fronting [the park] for recreational purposes." *Atahan,* 91 Hawai'i at 353,

984 P.2d at 112. The dissent, however, would have held that HRUS did not immunize the defendant-landowner because, by the statute's own terms, it did not apply to an injury occurring off of the defendant-landowner's land. *Atahan,* 91 Hawai'i at 355, 984 P.2d at 114 (Acoba, J., dissenting).

allegedly "commercial" purpose underlying their presence at the hotel would not defeat the application of HRUS. In our view, however, *Howard* misconstrued HRUS on this point.

C. *A person's subjective intent in being present on an "owner's" land is material to whether the person is a "recreational user" engaged in a "recreational purpose" at the time the person sustains a personal injury.*

■ HRUS unambiguously provides in relevant part that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes." HRS § 520-3. By its plain language, HRUS does not apply if a person is entering or using the land for a non-recreational purpose—*i.e.*, for a commercial purpose, such as purchasing or consuming a meal. HRUS is ambiguous, however, regarding the standpoint or perspective from which a "recreational purpose" is ascertained. Without resort to extrinsic interpretive aids, we are therefore unwilling to hold, as the Ninth Circuit did in *Howard*, that the subjective intent prompting a person to enter or use another's land is immaterial to the question whether HRS § 520-3 relieves a landowner of *any* duty to the person to keep the premises safe for "entry or use."

■ We note, however, as a preliminary matter, that the subjective intent of an "owner" of "land" is obviously relevant to whether he or she has directly or indirectly invited or permitted an injured party to "use" the "land" without "charge" for a "recreational purpose." Inasmuch as Grand Wailea held its beach front grounds open to the public, it equally obviously, albeit impliedly, invited and permitted the Crichfields to use its "land" without charge. Indeed, it is self-evident that Grand Wailea opened its grounds to the public both for commercial purposes—such as cultivating the good-will of visitors and thereby encouraging them to patronize the resort monetarily—and for recreational purposes—such as permitting public access to the beach and ocean or permitting the public freely to roam the grounds for exercise or pleasure. However, whether the Crichfields were exclusively "recreational" users furthering a "recreational purpose" within the meaning of HRUS, on the one hand, or, in addition, were "commercial" users on their way to patronize the Grand Wailea's cafe, on the other, constitutes a genuine issue of material fact.

■ In this connection, Grand Wailea urges that, inasmuch as the Crichfields' affidavits were unsigned at the time the circuit court conducted the hearing on Grand Wailea's motion for summary judgment, the circuit court should not have considered the factual allegations contained therein. Absent those factual allegations, Grand Wailea argues, the fact that the Crichfields entered and used Grand Wailea's land for a recreational purpose was uncontroverted and, therefore, the record failed to reflect a genuine issue of material fact. In light of HRCP Rule 56(f) (1997), we do not believe that the circuit court abused its discretion in considering the substantive allegations set forth in the Crichfields' affidavits. HRCP Rule 56(f) provides that,

[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order as is just.

In his sworn declaration attached to the Crichfields's memorandum in opposition, the Crichfields' counsel explained that the copies of the unsigned affidavits were being proffered because the Crichfields were on the mainland and he had not yet received the signed and notarized affidavits back from them. Thus, the circuit court would have been acting within its discretion if it had granted a continuance until the signed and notarized affidavits could be obtained. Instead, the circuit court proceeded with the hearing and deferred filing its order and final judgment until after the signed and notarized affidavits had been filed. Accordingly, the affidavits were a part of the record at the time the circuit court filed its order and judgment, and the factual allegations contained therein were properly considered by the circuit court.

We also reiterate that "mere suspicion that an affiant ... may be lying" is not an appropriate basis upon which to grant or deny a motion for summary judgment. *Cordeiro v. Burns,* 7 Haw.App. 463, 470, 776 P.2d 411, 416 (1989) (quoting *Haase v. Webster,* 807 F.2d 208, 212 (D.C.Cir.1986)). Although, as the ICA has held, the credibility of an affiant or deponent, standing alone, does not produce a genuine issue of material fact, the fact remains that, where the record evinces a conflict in the evidence regarding the content of an affidavit or deposition, then the issue of the affiant's or deponent's credibility involves more than a mere bald allegation that an affiant's or deponent's statements are self-serving fabrications, and, therefore, the credibility of the affiant or deponent must be assessed by the trier of fact. *Compare Cordeiro,* 7 Haw.App. at 469–71, 776 P.2d at 416–17 (credibility of deponent did not constitute a genuine issue of material fact where deposition was not self-serving and deponent's statements on record were not contradictory), and *Costa v. Able Distributors, Inc.,* 3 Haw.App. 486, 488–89, 653 P.2d 101, 104 (1982) (credibility of affiant did not constitute a genuine issue of material fact absent discrepancy or contradiction in affiant's statements on record), *with Jacoby v. Kaiser Foundation Hospital,* 1 Haw.App. 519, 526–28, 622 P.2d 613, 618 (1981) (credibility of affiant constituted an issue for the trier of fact).

For the reasons discussed below, if the Crichfields, from their subjective viewpoint, occupied the hotel's land for a commercial purpose—to wit, to have lunch, as they alleged in their affidavits—then HRUS would not immunize Grand Wailea from negligence liability.

D. *The Legislative History Of HRUS Confirms That The Statute Was Not Intended To Immunize Hotels, Resorts, Or Other Commercial Establishments From The Duty Of Care That Such A Commercial Establishment Would Otherwise Owe To Persons On The Commercial Establishment's Premises.*

When, in 1969, the senate was considering S.B. No. 56, the genesis of HRUS, the Committee on Lands and Natural Resources reported in relevant part:

> The purpose of this bill is to limit the liability of landowners who permit persons to use their property for recreational purposes without charge.
>
> *This bill would not affect the landowners' common law duty of care towards* house guests, *business invitees,* playmates of his [or her] children, or if he [or she] is guilty of willfully or maliciously failing to guard or warn persons against a dangerous condition or activity on the land.

Sen. Stand. Comm. Rep. No. 534, in 1969 Senate Journal, at 1075 (emphases added). In the house of representatives, the Committee on the Judiciary reported in relevant part:

> The purpose of this bill is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.
>
> Enactment of this bill would relieve the owner of land of his duty of care to keep the premises safe for entry or use by others for recreational purposes. A person who uses such property for recreational purposes would not be given the status of an invitee or licensee, and hence the landowner would not be liable for injuries to such persons. This relief of liability is not unlimited as it does not apply to willful or malicious acts, or situations where a fee is charged for the use of the land or for injuries suffered by a house guest while on the owner's premises.

Hse. Stand. Comm. Rep. No. 760, in 1969 House Journal, at 914.

Thus, the legislature enacted HRUS to encourage the recreational use of our state's resources by limiting landowners' liability to recreational users and, thereby, promoting the use and enjoyment of Hawaii's resources. Indeed, in amending HRUS in 1996, the legislature reaffirmed its original intent:

> ... The legislature finds that *encouraging the public to engage in recreational*

*activities makes for healthier citizens and allows everyone to enjoy Hawaii's natural resources.* In 1969, *when the legislature enacted chapter 520,* Hawai'i Revised Statutes, *to encourage wider access to lands and waters for hunting, fishing, and other activities, the intent was to make access easier and limit landowners' liability.*

1996 Haw. Sess. L. Act 151, § 1 at 328 (emphases added).

It follows from the foregoing that the "purpose" of HRUS is not only to encourage landowners to open up their lands for recreational purposes, but also to encourage the citizens of and visitors of Hawai'i to use and enjoy its resources, as well as to engage in the recreational activities, which are so characteristic of Hawai'i and directly related to those resources. To better achieve both goals, HRUS immunizes landowners from liability for personal injury arising out of the "use" of the owner's "land" for "recreational purposes"—*i.e.,* the recreational enjoyment of the natural resources that are an inextricable part of Hawaii's land and waters.

 Accordingly, HRUS was not intended—nor do we construe it—to have created out of whole cloth a universal defense available to a commercial establishment such as Grand Wailea, which has opened its land to the public for commercial gain, against any and all liability for personal injury merely because there is a "recreational" component to the establishment's operation. Indeed, to hold otherwise, as urged by Grand Wailea, would eviscerate the well-settled duty that Grand Wailea, as a possessor of land, owes to all people, whether paying patrons of its hotel or not, who enter on and use Grand Wailea's land intending to further purposes that are not "recreational" within the meaning of HRUS. As this court recently reaffirmed:

> [T]he general rule with respect to all landowners is that "[a] possessor of land, who knows or should have known of an unreasonable risk of harm posed to persons using the land, by a condition on the land, owes a duty to persons using the land to take reasonable steps to eliminate the unreasonable risk, or warn the users against it."

*Richardson v. Sport Shinko (Waikiki Corporation),* 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994) (quoting *Corbett v. Association of Apartment Owners of Wailua Bayview Apartments,* 70 Haw. 415, 415, 772 P.2d 693, 693 (1989)). *See also Birmingham v. Fodor's Travel Publications, Inc.,* 73 Haw. 359, 380, 833 P.2d 70, 81 (1992) ("an occupier of land ... 'has a duty to use reasonable care for the safety of all persons reasonably anticipated to be upon the premises[,]' " (quoting *Pickard v. City & County of Honolulu,* 51 Haw. 134, 135, 452 P.2d 445, 446 (1969))); *Bidar v. AMFAC, Inc.,* 66 Haw. 547, 552, 669 P.2d 154, 159 (1983) (applying *Pickard* duty of care to hotel operator). Thus, it is an untenable proposition that Grand Wailea does not—by virtue of a universal defense made applicable by HRUS to an owner of land that the owner has opened to the public for recreational use—owe a duty to use reasonable care for the safety of the Crichfields, if, as they aver in their affidavits, they entered on and used Grand Wailea's land for the purpose of commercially patronizing the hotel's cafe or, in other words, intending to engage in a purpose that is not "recreational" within the meaning of HRUS. By the same token, the commercial nature of Grand Wailea's operation does not automatically foreclose the availability of a HRUS defense if a person is injured on its "land" while furthering or intending to further a "recreational purpose."

We hold that the Crichfields, by averring in their affidavits that they were on Grand Wailea's "land" for a commercial purpose at the time Cheryl sustained her personal injury, generated a genuine issue of material fact, to wit, whether they were present on Grand Wailea's "land," *inter alia,* for a commercial purpose at the time of Cheryl's injury, in which case HRUS would not immunize Grand Wailea from liability, or, alternatively, whether they were present for an exclusively recreational purpose, in which case HRUS would be available to Grand Wailea as a defense to the Crichfields' negligence claim. The circuit court therefore erred in granting summary judgment in favor of Grand Wailea and against the Crichfields.

## IV. CONCLUSION

Based on the foregoing analysis, we vacate the circuit court's order, filed on September 13, 1999, granting summary and final judgment against them and in favor of Grand Wailea and remand the matter to the circuit court for further proceedings consistent with this opinion.