145 P.3d 879

**Althia VIDINHA, Plaintiff–Appellant,**

**and**

**Warren Vidinha, Cory Vidinha, Kellie Anne Vidinha, Joey Vidinha, Brandon Vidinha and Brittany Vidinha, Plaintiffs,**

**v.**

**Clyde T. MIYAKI, M.D., and Sharon Lawler, M.D., Defendants–Appellees,**

**and**

**The Queen's Medical Center, John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, and Doe Partnerships 1–10, Defendants.**

**No. 26188.**

Intermediate Court of Appeals of Hawai'i.

Oct. 9, 2006.

Michael Jay Green (David J. Gierlach, Honolulu, and Debra A. Kagawa with him on the briefs), for plaintiff-appellant.

George W. Playdon, Jr. (Kelvin H. Kaneshiro and Lisette S. Blumhardt with him on the briefs, Reinwald O'Connor, & Playdon), Honolulu, for defendants-appellees.

BURNS, C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by FUJISE, J.

Plaintiff–Appellant Althia Vidinha (Vidinha) appeals from the First Amended Final Judgment filed on October 21, 2003. The Circuit Court of the First Circuit (circuit court)[1] granted Defendant–Appellees Clyde T. Miyaki, M.D. (Miyaki) and Sharon Lawler, M.D.'s (Lawler, or collectively, Defendants) motion for summary judgment on December 2, 2002.

On appeal, Vidinha contends the circuit court erred in granting summary judgment because genuine issues of material fact existed with regard to whether (1) the statute of limitations for her lawsuit had tolled and (2)

---

1. The Honorable Eden Elizabeth Hifo presided.

2. "CAT" stands for computerized axial tomography which is a computer assisted x-ray. *Dorland's Illustrated Medical Dictionary*, 305, 1919 (30th ed.2003).

3. An endoscopic retrograde cholangiopancreatography (ERCP) is "a procedure consisting of a combination of retrograde cholangiography and transhepatic cholangiography, used to demonstrate all portions of the biliary tree; performed by cannulation of the common bile duct and pancreatic duct through the papilla of Vater using a flexible fiberoptic endoscope with retrograde injection of radiopaque contrast media. *Dorland's Illustrated Medical Dictionary, supra* n. 2, at 351.

4. Sharon Lawler's (Lawler) notes in Althia Vidinha's (Vidinha) medical records described the pre- and post-ERCP events this way:

HISTORY OF PRESENT ILLNESS: This is a patient with a history of asthma who had been doing fairly well until about a week prior to admission. The patient was complaining of some right upper quadrant discomfort and some indigestion. She also had an abdominal CT scan done due to pyelonephritis during an admission in December of 1996. The patient had a repeat CT scan done to follow up on the abnormal kidney as well as to check the right

Defendants should be equitably estopped from asserting the statute of limitations as a bar to Vidinha's claim. As we agree with Vidinha, we vacate the judgment and remand for further proceedings.

**I.**

Vidinha was Lawler's longstanding patient. On or about April 1, 1997, Lawler saw Vidinha, "complaining of some right upper quadrant discomfort and some indigestion." A "CAT"[2] scan revealed "a possible distal bile duct stone" and Lawler recommended that an endoscopic retrograde cholangiopancreatography (ERCP)[3] be done. After Vidinha learned that the doctor recommended by others was unavailable, she asked Lawler if Miyaki could perform the ERCP. Miyaki, who is Lawler's husband, performed the procedure the following day, April 8, 1997, but according to Defendants, "was unsuccessful in cannulating the common bile duct and after several attempts, terminated the procedure."[4] Miyaki reported in the Endoscopy

upper quadrant. CAT scan showed a possible distal bile duct stone. The patient underwent ERCP on the day prior to admission. She had an uneventful postoperative stay and was sent home. About three hours later, she began to complain of severe epigastric right upper quadrant pain with nausea. She was seen in the Emergency Room and noted to have a moderately tender epigastric and right upper quadrant area with no rebound and no guarding. White count was elevated to 18,000, amylase was elevated to over 5,000. The patient was having severe pain and was then admitted for further workup and evaluation for post ERCP pancreatitis.

. . . .

IMPRESSION:
PROBLEM # 1. Acute pancreatitis with elevated amylase and lipase, moderately elevated white count secondary to post ERCP manipulation. Calcium is okay at this time. No fever. Although white count is not elevated, this may be secondary to stress. **PLAN:** (1) IV fluids. (2) Parenteral pain medications. (3) Nausea medications p.r.n. (4) Abdominal series. (5) Follow up liver function tests, calcium, amylase and lipase. (6) IV fluid hydration until able to take p.o.
PROBLEM # 2. History of asthma. Otherwise stable at this time. **PLAN:** (1) IV aminophylline until taking p.o. well. (2) Ventolin updrafts p.r.n.
PROBLEM # 3. Status post appendectomy.

Record that "½ str. Omnipaque injected 25 cc into pancreatic duct."

Several hours after the ERCP procedure, Vidinha returned to the hospital complaining of "severe epigastric right upper quadrant pain with nausea." Vidinha was then admitted into the hospital for "further workup and evaluation for post ERCP pancreatitis." After examination, Dr. Mihae Yu (Dr. Yu) recommended exploratory surgery.[5] Defendants stated in their moving papers that, after the surgery, Vidinha contracted three hospital-borne infections which led to sepsis and remained in the hospital until July 29, 1997.

During her hospital stay and after being transferred from the intensive care unit, Vidinha was informed by Dr. Yu that she would need to stay in the hospital for four more months. Distressed by this news and concerned about her ability to pay her bills while in the hospital for this length of time, she communicated this concern to Lawler, who, according to Vidinha,[6] offered to assist Vidinha with her financial obligations.

Later in the year, Vidinha went to Virginia Mason Medical Center in Seattle, Washington, where she described the major medical reasons for the visit this way:

> I had an ERCP done in April of this year and developed a severe case of pancreatitis. The drainage from my wound has not stopped since my surgery. Dr. Grobe feels that hopefully you can correct this. (I pray that you can.)

She also reported that her gall bladder and part of her pancreas were removed by Dr. Yu in April 1997.

Vidinha consulted with lawyer Richard Fried, Jr. "to find the answers I was looking for" and signed a release on August 23, 1997, which was forwarded by Fried's office to Miyaki with a request for "all medical records and correspondence concerning [Vidinha] from her date of initial treatment/service onward." Vidinha believed that Mr. Fried "would have people that would know how to interpret these records" but ultimately she did not get her "answers" from Mr. Fried.

Vidinha also consulted with the law firm of Trecker & Fritz in the winter of 1997–98.

Meanwhile, Vidinha was not able to work after the ERCP procedure. Lawler helped Vidinha with obtaining disability benefits and paid Vidinha's medical insurance premiums. In June 1998, Vidinha asked Lawler to help her pay her bills. Lawler paid an unspecified number of Vidinha's bills and paid her mortgage through June 1999. Some of these payments were made from a checking account in Miyaki's name but signed by Lawler. Lawler made an additional payment of $30,895.11 to the mortgage company using a City Bank check in January 2000. In July 2000, after realizing her mortgage company had instituted foreclosure proceedings on her house and that Lawler was no longer paying the mortgage, Vidinha sought the advice of her current attorney.

Vidinha filed a complaint with the Medical Claims Conciliation Panel on September 20, 2000. She filed her complaint in the instant case on May 11, 2001, alleging medical malpractice and fraud on the part of Defendants and The Queen's Medical Center.[7]

---

PROBLEM # 4. History of peptic ulcer disease. **PLAN:** Empiric H2 blocker. Defendants represent the outcome of the ERCP in their moving papers.

5. The only portion of Vidinha's medical record written by Dr. Mihae Yu included in the record on appeal is the report attached as Exhibit F to Defendants' motion for summary judgment. It reads, in pertinent part,
DATE OF OPERATION: 5/19/97
PREOPERATIVE DIAGNOSIS: Respiratory failure.
Necrotizing pancreatitis secondary to endoscopic retrograde cholangiopancreatography.
POSTOPERATIVE DIAGNOSIS: Respiratory failure.

Necrotizing pancreatitis secondary to endoscopic retrograde cholangiopancreatography.
OPERATION PERFORMED: Percutaneous tracheostomy.

6. This version of events was contained in Vidinha's affidavit, attached to her memorandum in opposition to the motion for summary judgment. It was Defendants' position, as stated in their memorandum in support of their motion, that Vidinha asked for, and Lawler agreed to, loan Vidinha the funds "to help make ends meet." At oral argument, Defendants' counsel represented that these funds were a gift.

7. On June 25, 2001 the parties stipulated to the dismissal of all claims against The Queen's Medi-

On October 1, 2002, Defendants moved for summary judgment (motion) on the basis that the statute of limitations had run on the medical malpractice claim against Miyaki without any basis for its tolling and that "without a viable medical malpractice claim ... all other claims asserted in the Complaint fail as a matter of law." Vidinha, in her opposition papers, argued that the statute of limitations had not run because she did not discover her claim until she consulted with her attorney in July 2000 and that Defendants should be estopped from asserting the statute of limitations as a defense because their conduct induced Vidinha to delay filing suit.[8]

On November 4, 2002, after a hearing on the motion, the circuit court, concluding "good cause appearing therefor," granted Miyaki and Lawler's motion. Vidinha timely appeals the resulting First Amended Final Judgment filed on October 21, 2003.

## II.

■ Vidinha contends that the circuit court erred in granting summary judgment because there was a genuine issue of material fact regarding the accrual of her cause of action and whether Defendants should be estopped from asserting the statute of limitations as a defense.

■ "We review the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citing *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)).

The Hawai'i Supreme Court has often articulated that

summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin*, 107 Hawai'i at 56, 109 P.3d at 697 (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)).

■ " 'A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.' " *Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 482–83, 6 P.3d 349, 354–55 (2000) (quoting *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982)). "[A] 'genuine issue as to any material fact' ... under a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result." *Richards v. Midkiff*, 48 Haw. 32, 39, 396 P.2d 49, 54 (1964) (citation omitted).

■ In reviewing a circuit court's grant or denial of a motion for summary judgment, " 'we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion].' " *Crichfield*, 93 Hawai'i at 483, 6 P.3d at 355 (quoting *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). "[A]ny doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party." *GECC Fin. Corp. v. Jaffarian*, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App.1995) (citations omitted).

---

cal Center. On July 20, 2001, Clyde T. Miyaki and Lawler filed a motion to dismiss the loss of consortium claims (Count III) by Warren Vidinha, Cory Vidinha, Kellie Anne Vidinha, Joey Vidinha, Brandon Vidinha and Brittany Vidinha, for failing to comply with Hawaii Revised Statutes (HRS) Chapter 671, the Medical Claims

Conciliation Panel provisions. On September 13, 2001, the Circuit Court of the First Circuit granted the motion without prejudice.

**8.** Vidinha also withdrew her claims contained in Counts VII (Fraudulent Inducement) and IX (Fraudulent Concealment) at this time.

## A.

■ The statute of limitations begins to run "the moment the plaintiff's cause of action accrues-that is, under [Hawaii Revised Statutes (HRS)] §§ 657-7 and 657-7.3, the moment plaintiff discovers or should have discovered the negligent act, the damage, and the causal connection between the former and the latter[,]" *Yamaguchi v. Queen's Med. Ctr.*, 65 Haw. 84, 90, 648 P.2d 689, 693-94 (1982) (citing *Jacoby v. Kaiser Found. Hosp.*, 1 Haw.App. 519, 622 P.2d 613 (1981)), otherwise known as the discovery rule.[9] Stated another way, "[n]ot only does the plaintiff have to discover the injury and the cause, but also that the cause violated the applicable duty of care, i.e., that the cause was negligent." *Jacoby*, 1 Haw.App. at 524 n. 2, 622 P.2d at 616 n. 2.

■ However, the discovery rule is not without limit. It includes a duty of reasonably diligent inquiry, which in turn requires prompt consultation with those in the medical and legal community.[10] We find useful the following discussion by the Pennsylvania Supreme Court on the meaning of "reasonable diligence:"

> As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause. We have clarified that in this context, reasonable diligence is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the fact upon which his right to recovery is premised. As we have stated: " '[T]here are [very] few facts which diligence cannot

> discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.' " Put another way, "[t]he question in any given case is not, what did the plaintiff know of the injury done him? [B]ut, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?" While reasonable diligence is an objective test, "[i]t is sufficiently flexible ... to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." Under this test, a party's actions are evaluated to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others."

*Fine v. Checcio*, 582 Pa. 253, 267, 870 A.2d 850, 858 (2005) (citations omitted).

Vidinha filed the instant suit on May 1, 2001. She claimed by affidavit that she did not know that pancreatitis was a risk factor of the ERCP procedure, that the ERCP procedure was "not indicated" for her condition or that the amount of dye injected during the ERCP procedure was "a precipitating factor of the pancreatitis" until after she consulted with her present attorney in July of 2000. Defendants dispute this, thus raising a genuine issue of material fact about when Vidinha actually knew of her cause of action.

---

9. This rule, originally recognized in *Yoshizaki v. Hilo Hospital*, 50 Haw. 150, 154, 433 P.2d 220, 223 (1967), resulted in the present language in the statute of limitations for medical malpractice cases, HRS § 657-7.3 (1993):

> No action for injury or death against ... physician or surgeon, ... duly licensed or registered under the laws of the State, or a licensed hospital as the employer of any such person, based upon such person's alleged, professional negligence, or for rendering professional services without consent, or for error or omission in such person's practice, shall be brought more than two years after the plaintiff discovers, or through the use of reasonable

diligence should have discovered, the injury, but in any event not more than six years after the date of the alleged act or omission causing the injury or death.

10. This duty of prompt consultation was an integral part of Hawai'i's discovery rule. In *Jacoby v. Kaiser Found. Hosp.*, 1 Haw.App. 519, 524-25, 622 P.2d 613, 616-17 (1981), this court reasoned that the potential for unreasonable delays in bringing lawsuits foreseen by Justice White under the Federal Tort Claims Act could be thereby avoided. *Id.* (citing *United States v. Kubrick*, 444 U.S. 111, 123-24, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)).

However, even if we assume Vidinha did not actually discover the alleged negligence until July 2000, the question becomes whether she should have, using reasonable diligence, discovered the negligence more than two years before she filed the present suit.

Vidinha knew that she sought medical attention for abdominal pain, saw Lawler and had the ERCP procedure recommended by Lawler and performed by Miyaki in early April 1997. Within hours after the procedure, she returned to the hospital for pain in the same area of her body. She was released from the hospital at the end of July 1997 and obtained her medical records sometime that fall. The medical records revealed, at least generally, what was done.

However, the only portions of the medical reports submitted to the circuit court were the 2–page, June 8, 1997 psychiatric consultation report by Dr. Gary A. Okamoto, the 3–page, April 8, 1997 report by Lawler,[11] the 2–page, May 19, 1997 report on the Percutaneous tracheostomy[12] submitted by Drs. Betty Hosohama and Mihae Yu, the 1–page, April 7, 1997 "Endoscopy Record" signed by Miyaki, the 1–page, April 7, 1997 "IV Therapy Flowsheet," the 2–page, April 4, 1997 consent form signed by Vidinha, and Virginia Mason Medical Center's 2–page, undated, "Pre–History Form" signed by Vidinha.

These reports do not include a description of the ERCP procedure, as it was performed on Vidinha, in any detail, except that "½ str. Omnipaque injected 25 cc into [Vidinha's] pancreatic duct." Although some of the reports state that the pancreatitis was "secondary to" or "following" the ERCP procedure, there is nothing that indicates, at least to the lay person, that the ERCP was not appropriate to Vidinha's condition or improperly performed by Miyaki. Thus, we cannot say that the evidence presented below established the inescapable conclusion that Vidinha should have known Defendants were negligent.

■ Nor can we say, on this record, that Vidinha did not exercise reasonable diligence. It is undisputed that she sought the expertise of doctors and lawyers within six months after she was discharged from the hospital. What is in dispute is what she learned as a result.

When there has been a belated discovery of the cause of action, the issue whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide. The drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence.

*Jacoby*, 1 Haw.App. at 528, 622 P.2d at 618 (quoting *Enfield v. Hunt*, 154 Cal.Rptr. 146, 147, 91 Cal.App.3d 417, 419 (1979)). Based on the state of this record, whether Vidinha exercised reasonable diligence is a matter for the trier of fact to decide.

### B.

■ Even if Vidinha filed more than two years after she discovered or should have discovered her claim, she also contends that Defendants should be equitably estopped from using the statute of limitations as a defense. It is well-settled that " 'a defendant cannot avail [her or] himself of the bar of the statute of limitations, if it appears that he [or she] has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run against him [or her].' " *Mauian Hotel, Inc. v. Maui Pineapple Co.*, 52 Haw. 563, 570–71, 481 P.2d 310, 315 (1971) (quoting *Hornblower v. George Washington Univ.*, 31 App. D.C. 64, 75 (1908)). "One invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, and that such reliance was reasonable." *Doherty v. Hartford Ins. Group*, 58 Haw. 570, 573, 574 P.2d 132, 134–35 (1978) (citations omitted).

---

11. The relevant portions of this report are reproduced above, at n. 4.

12. "Percutaneous" means "performed through the skin." *Dorland's Illustrated Medical Dictionary, supra* n. 2, at 1398. "Tracheostomy" can mean either the "surgical creation of an opening into the trachea through the neck, with the tracheal mucosa being brought into continuity with the skin," or the "creation of an opening in the anterior trachea for insertion of a tube to relieve upper airway obstruction and facilitate ventilation." *Id.* at 1929.

Vidinha averred that because Lawler said that "she would take care of [Vidinha's] financial obligations and promised that [she] would not lose [her] home" and paid some of Vidinha's bills through January 2000, Vidinha relied on Lawler's actions and did not pursue her claim until after the statute of limitations ran. Defendants argued below that these payments constituted a loan and that, in any event, they were made by Lawler, not Miyaki, so that Miyaki should not be estopped from asserting the statute.

That Lawler made substantial payments towards Vidinha's medical insurance [13] and mortgage [14] was not in dispute. Nor was it disputed that Lawler and Miyaki were married and that the checks used to make these payments were from both Lawler's and Miyaki's accounts, although they were all signed by Lawler. However, the purpose of these payments, why they stopped when they did, whether Miyaki knew of and/or approved of these payments and whether Vidinha relied on these payments in not pursuing her claim was definitely in dispute. This dispute was for the trier of fact to decide at trial. *Del Rosario v. Kohanuinui*, 52 Haw. 583, 586–87, 483 P.2d 181, 183 (1971) (evidence did not preclude possibility actions induced plaintiff's late filing).

### III.

The Circuit Court of the First Circuit's October 21, 2003 First Amended Final Judgment is hereby vacated and the matter is remanded for further proceedings consistent with this opinion.

---

13. Vidinha submitted copies of Lawler's payments of Vidinha's medical insurance premiums from July 1997 through November 1998, for a total of $9,772.

14. Copies of cancelled checks amounting to $43,104.13 in payment of Vidinha's mortgage were also submitted.