156 P.3d 482

**MAKILA LAND CO., LLC,**
Plaintiff–Appellee,

v.

**Ke'eaumoku KAPU, Defendant–Appellant**

and

**Heirs or Assigns of Apaa (k), July Simeona, and all whom it may concern, Defendants.**

No. 25875.

Intermediate Court of Appeals of Hawai'i.

April 28, 2006.

As Corrected June 13, 2006.

James Richard McCarty, on the briefs, for Defendant–Appellant.

Donald E. Scearce, on the briefs, Honolulu, for Defendant–Appellee.

BURNS, C.J., WATANABE and FUJISE, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Keʻeaumoku Kapu (Keʻeaumoku or Defendant Kapu) appeals from the circuit court's [1] May 15, 2003 Final Judgment in favor of Plaintiff–Appellee Makila Land Co., LLC (MLC), entered pursuant to the circuit court's May 7, 2003 Order Granting Plaintiff's Summary Judgment Motion. We vacate and remand.

## RELEVANT STATUTE

Hawaii Revised Statutes (HRS) § 1–13 (1993) states:

> **Official languages.** English and Hawaiian are the official languages of Hawaii. Whenever there is found to exist any radical and irreconcilable difference between the English and Hawaiian version of any of the laws of the State, the English version shall be held binding. Hawaiian shall not be required for public acts and transactions.

## PRECEDENT STATING THE BURDEN OF PROOF

■ In an action to quiet title, the burden is on the plaintiff to prove title in and to the land in dispute, and, absent such proof, it is unnecessary for the defendant to make any showing. *State v. Zimring,* 58 Haw. 106, 110, 566 P.2d 725, 729 (1977) (citations omitted). The plaintiff has the burden to prove either that he has paper title to the property or that he holds title by adverse possession. *Hustace v. Jones,* 2 Haw.App. 234, 629 P.2d 1151 (1981); *see also Harrison v. Davis,* 22 Haw. 51, 54 (1914). While it is not necessary for the plaintiff to have perfect title to

1. The Honorable Shackley F. Raffetto presided.

2. A "konohiki" is the "[h]eadman of an *ahupuaʻa* land division under the chief[.]" Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary*

establish a prima facie case, he must at least prove that he has a substantial interest in the property and that his title is superior to that of the defendants. *Shilts v. Young,* 643 P.2d 686, 689 (Alaska 1981). *Accord Rohner v. Neville,* 230 Or. 31, 35, 365 P.2d 614, 618 (1961), reh'g denied, 230 Or. 31, 368 P.2d 391 (1962).

*Maui Land & Pineapple Company, Inc. v. Infiesto,* 76 Hawaiʻi 402, 407–8, 879 P.2d 507, 512–13 (1994).

## RELEVANT HISTORICAL FACT

Real property laws in Hawaiʻi differ from real property laws in other jurisdictions in the United States.

> In 1845, the government created the Board of Land Commissioners to investigate and settle all land claims of private individuals, whether native or foreign. The Land Commission subsequently adopted seven principles to guide them in deciding all claims. The commission's work led to the *Mahele* of 1848, the division of lands between the king and the *konohiki* [2]. Those lands retained by the king were subsequently divided into Government Lands and King's Lands.

Melody Kapilialoha MacKenzie ed., *Native Hawaiian Rights Handbook* 151 (1991) (footnote added).

> All lands of the king, the government, and the *konohiki* were awarded subject to the rights of native tenants. In 1850, the enactment of further principles or the *Kuleana* Act empowered the Land Commission to award fee simple title to native tenants for their plots of land or *kuleana.* ... The awards were limited to the amount of land actually cultivated, plus small houselots distinct from the cultivated lands. When the Land Commission confirmed an individual's land claim, it issued an award of that land to the claimant. Generally, upon payment of a commutation tax to the government, the minister of the

166 (rev. ed.1986). An "ahupuaʻa" is a "[l]and division usually extending from the uplands to the sea[.]" *Id.* at 9.

interior conveyed complete title in the form of a royal patent.

*Id.* at 151–52.

## BACKGROUND

On March 4, 2002, MLC filed a complaint to quiet title to the following real estate in the County of Maui: 'āpana 1,[3] Land Commission Award 6507, Royal Patent 3457 ('āpana 1). In the complaint, MLC asserts:

1. Apana 1 of Land Commission Award 6507, Royal Patent 3457, was awarded on September 15, 1857[4] to APAA (k)[5], who did not convey during life, and died intestate, whereupon title descended to his son, Momona, who conveyed by Deed dated September 20, 1892, recorded in Book 135, Page 457, to Paul Isenberg and C.F. Horner, after which title vested by mesne conveyances in [MLC].

2. [MLC] and its predecessors in title were in adverse possession of the real property described above in excess of 10 years prior to May 4, 1973, and in excess of 20 years prior to the date hereof. The claims of all persons of an estate or interest in the real property described above, adverse to [MLC's] fee simple title, are barred by adverse possession thereof by [MLC] and its predecessors in title in excess of 10 years prior to May 4, 1973, and in excess of 20 years prior to the date hereof.

(Footnotes added.)

The complaint was filed against "Heirs or assigns of APAA (k), and ALL WHOM IT MAY CONCERN." It asked the court to "[e]nter judgment that [MLC] is the owner in fee simple of Apana 1 of Land Commission Award 6507, Royal Patent 3457, to Apaa[.]"

On March 27, 2002, Defendant July Simeona filed an objection. On May 2, 2002, Ke'eaumoku filed an answer.

On March 24, 2003, MLC filed Plaintiff's Summary Judgment Motion (SJ Motion). In the SJ Motion, MLC argued only its paper title claim. More specifically, in the "Supporting Memorandum", MLC stated, in relevant part:

[MLC] has moved the Court pursuant to Haw[.] R. Civ. P. 56 for summary judgment. The evidence establishes as a matter of law that title is vested in [MLC]. *Maui Land & Pineapple Co. v. Infiesto*, 76 Hawai'i 402, 408, 879, [sic] P.2d 507, 512 (1994) (quiet title action plaintiff has burden of proving paper title or title by adverse possession).

. . . .

Although the heirs of APAA (k), to whom Apana 1 of Land Commission Award 6507 was awarded, were never judicially determined, Momona's 1872 Lease recitation that APAA (k) was his father evidences that title descended from APAA (k) to his son, Momona. (Exhibit 1, Colleen H. Uahinui Declaration). . . .

Momona conveyed by Deed dated September 20, 1892, recorded in Book 135, Page 457, to Paul Isenberg and C.F. Hor-

---

**3.** An " 'āpana" is a "piece, slice, portion, fragment, section, segment, installment, part, land parcel, lot, district, sector, ward, precinct. . . ." "A *kuleana*, land division, may consist of several *'āpana.*" Pukui & Elbert, *supra* note 2, at 28.

**4.** A "Palapala Sila Nui" is a "royal patent". Jon J. Chinen, *Original Land Titles in Hawaii* 56 (1961).

Palapala Sila Nui 3457 was signed by "Kamehameha" on December 16, 1856.

The Colleen H. Uahinui Declaration, attached to Plaintiff–Appellee Makila Land Co., LLC's (MLC) Summary Judgment Motion filed on March 24, 2003, states that "APAA (k) filed his claim for Apana 1 of Land Commission Award 6507 in 1848" and "Apana 1 of Land Commission Award 6507, Royal Patent 3457, was awarded in 1852[sic] to APAA (k)."

The Act of 1860 authorized awards of land to konohiki whose names appeared in the Mahele Book of 1848 but had failed to file claims to the Land Commission. The awards were issued in the name of the original claimant, whether alive or dead. *Territory v. Gay*, 26 Haw. 382, 398 (1922); *Smith v. Hamakua Mill Company*, 15 Haw. 648, 660 (1904).

Under the act of July 29, 1872, Royal Patents based on Land Commission Awards were issued "in the name of the person to whom the original award was made, even though such person be deceased or the title to the real estate thereby granted have [sic] been alienated." *Id.* at 661.

**5.** In genealogical documentation, the "k" or "(k)" denotes "male". Similarly, the "w" or "(w)" in such document denotes "female". Edith Kawelohea McKinzie, *Hawaiian Genealogies* Vol. 1, xiii (1983).

ner, after which title vested by mesne conveyances in [MLC]. (¶ 4, Colleen H. Uahinui Declaration).

As a matter of law, the evidence establishes that title is vested in [MLC].

The record on appeal includes a submission by Ke'eaumoku of a copy of what appears to be a page from the records of the Bureau of Conveyances[6] containing an excerpt from the November 6, 1872 Lease (1872 Lease) written in the Hawaiian language. Although parts of the passage are not legible,[7] the relevant part reads as follows: "Lahaina . . . Kooka mokupuni o Maui . . . keia apana aina mai ia Apaa kuu makuakane. . . ."

In support of the SJ Motion, MLC offered an October 11, 1990 translation by Frances N. Frazier (Frazier) of the 1872 Lease.[8] This translation states, in relevant part:

MOMONA TO WEST MAUI SUGAR CO. LEASE

Know all men by these presents that I, Momona [k] of Kawananakoa, Honolulu, Island of Oahu, Party of the First Part, and John O. Dominis of this same place, for the West Maui Sugar Co., the Party of the Second Part

Witnesseth: [Momona] has . . . leased, and by these presents does . . . lease his parcels of land situate at Lahaina, at Kooka, Island of Maui. I received this parcel [sic] of land from Apaa, my own father and this property of Apaa is described in Royal Patent No. 3457, Land Commission Award No. 6507, as follows:

Parcel 2. Commencing at the North corner of this, run:

| South | 58 ⅜° | West | 5.61 | chains | along | Namauu |
|---|---|---|---|---|---|---|
| South | 59° | East | 3.60 | " | " | " |
| North | 44 ½° | East | 3.34 | " | " | Polanui |
| North | 17 ½° | West | 2.37 | " | " | Olelo |

to place of beginning. 1 acre 1 rood[9] 3 rods[10]

Parcel ['āpana] 3. Commencing at the North corner of this, run:

| South | 52° | West | 2.89 | chains | along | Manu |
|---|---|---|---|---|---|---|
| South | 78 ⅜° | East | 2.00 | " | " | Namauu |
| North | 88 ½° | East | 1.58 | " | " | Hoonaulu |
| North | 30 ½° | West | 2.47 | " | " | Namauu |

to place of beginning. 01 Rood 22 Rods

These I do convey by lease unto J.O. Dominis, aforesaid Party of the Second Part for Five Years, commencing on the sixth day of March, A.D. One thousand Eight hundred Seventy-three for the sum of Thirty-five Dollars per annum until the end of this lease.

(Language as in the original; block format changed.) Thus, Frazier translated "Lahaina . . . Kooka mokupuni o Maui . . . keia apana aina mai ia Apaa kuu makuakane . . . ." as saying "Lahaina, at Kooka, Island of Maui. I received this parcel [sic] of land from Apaa, my own father[.]"

This 1872 Lease from Momona concerned 'āpana 2 and 'āpana 3. It did not concern 'āpana 1. In addition to the signatures of two witnesses, the 1872 Lease was signed by "Momona", "John O. Dominis", and "Kamai"[11].

---

6. The Hawaii Revised Statutes (Supp.2005) states, in relevant part:

§ 502–1 **Registrar; appointment; tenure; salary.** There shall be a bureau in the department of land and natural resources to be called the bureau of conveyances. A registrar of conveyances shall be appointed by the board of land and natural resources, under chapter 76, and shall be superintendent of the bureau. The registrar shall receive such salary as shall be provided by law.

7. The document is handwritten in cursive. Although some words are clear, the combination of the handwriting and the degradation caused by copying methods make some of the parts of the record illegible. We have therefore excerpted a small part of the document which includes the contested wording.

8. The November 6, 1872 Lease translation was signed by Frances N. Frazier (Frazier) and stated: "Translated by Frances N. Frazier truly and correctly to the best of my ability." It was neither notarized nor signed by a witness.

9. A " 'rood of land': The fourth part of an acre in square measure, or one thousand two hundred and ten square yards." *Black's Law Dictionary With Pronunciations* 1194 (5th ed.1979).

10. A " 'rod': A lineal measure of 5½ yards or 16½ feet[.]" *Id.* Also, "a square rod", *Merriam–Webster's Collegiate Dictionary* 1079 (11th ed.2004); or "30.25 square yards", *Id.* at 1420.

11. The translation contains the following "Translator's note: No explanation as to identity of Kamai."

MLC contends, and Keʻeaumoku does not dispute, that Apaa died without judicially determined heirs.

In the SJ Motion, MLC alleged that "Momona conveyed [ʻāpana 1, 2, and 3] by Deed dated September 20, 1892, recorded in Book 135, Page 457, to Paul Isenberg and C.F. Horner[.]" The June 16, 1985 translation by Frazier of this September 20, 1892 Deed (1892 Deed) states, in relevant part: [12]

Know all men by these presents that I, Momona (K) of Honolulu, Island of Oahu, do hereby . . . convey absolutely unto Paul Isenberg and C.F. Horner, . . . those entire parcels of land situate at Kooka, Lahaina, Maui, whose boundaries are described in Royal Patent No. 3457, Land Commission Award No. 6507, containing 5 acres, 1 rood and 6 rods.

In its Supporting Memorandum, MLC stated, in relevant part:

1. *Title.* Title to Apana 1 of Land Commission Award 6507 is traced in chart form as follows:

APAA(k)

Heir = Son

Momona

Deed
September 20, 1892; Book 135, Page 457

Paul Isenberg and C.F. Horner

Mesne Conveyances
[MLC]

. . . .

Although the heirs of APAA (k), to whom Apana 1 of Land Commission Award 6507 was awarded, were never judicially determined, Momona's 1872 Lease recitation that APAA (k) was his father evidences that title descended from APAA (k) to his son, Momona. (Exhibit 1, Colleen H. Uahinui Declaration). Haw. R. Evid. 803(b)(15) (pedigree recital admissible to show grantor's relationship to deceased owner); *Hana Ranch, Inc. v. Kanakaole,* 1 Haw.App. 573, 577, 623 P.2d 885, 888 (1981) (pedigree recital is competent evidence of descent); *Apo v. Dillingham Invest. Corp.,* 57 Haw. 64, 67–69, 549 P.2d 740, 743 (1976) (pedigree recital evidences grantor's relationship to deceased owner); Haw.Rev.Stat. § 532–4(a) (intestate's property descends to intestate's issue).

Momona conveyed by Deed dated September 20, 1892, recorded in Book 135, Page 457, to Paul Isenberg and C.F. Horner, after which title vested by mesne conveyances in [MLC]. (¶ 4. Coleen H. Uahinui Declaration).

As a matter of law, the evidence establishes that title is vested in [MLC]. *Hustace v. Kapuni,* 6 Haw.App. 241, 246, 718 P.2d 1109, 1113, n. 10 (1986) (title proved by deed, devise, intestate succession).

In sum, MLC presented evidence that (1) Apaa (k) died and was survived by his son Momona; (2) by operation of law,[13] ʻāpana 2 and 3 passed to Momona from Apaa, his "makuakane", and by inference also ʻāpana 1; (3) in 1872, Momona leased ʻāpana 2 and ʻāpana 3 to John O. Dominis; (4) in 1892, Momona conveyed the land "whose boundaries are described in Royal Patent No. 3457, Land Commission Award No. 6507, containing 5 acres, 1 rood and 6 rods[,]" to Paul Isenberg and C.F. Horner; and (5) the chain of title from Paul Isenberg and C.F. Horner to MLC is unbroken.

Keʻeaumoku filed the Memorandum of Defendant Keʻeaumoku Kapu in Opposition to Plaintiff's Motion for Summary Judgment (Opposition Memorandum) on April 11, 2003.

---

12. MLC did not place a copy of the original Hawaiian language version of the September 20, 1892 Deed in the record. Defendant–Appellant Keʻeaumoku Kapu (Keʻeaumoku) did not indicate any disagreement with the June 16, 1985, translation by Frazier.

13. The laws of intestacy at that time generally provided that a decedent's heir(s) was (were) his (her) issue. Hawaiian Laws 1841–1842, at 68 ("When the parent dies, then the child is the heir, if there be any child living."); Statutory Laws of His Majesty Kamehameha III 1845–1846, at 199 ("The rules of descent and of natural inheritance shall be those defined by the civil code[.]"); Civil Code of 1859, at 349–52 ("The property shall be divided equally among the intestate's children[.]")

In the Opposition Memorandum, Keʻeaumoku stated, in relevant part:

[MLC] tries to support its claim of paper title connection between "MOMONA" referenced in the deed and APAA by claiming that the Hawaiian word "MAKUAKANE" contained in the 1872 Lease by MOMONA proves that MOMONA was a son of APAA and that he had title to Apana 1.

The Affidavit of Kalani Kapu, however, states that the Hawaiian word "MAKUAK-ANE" as used in the Deed does not mean what [MLC] contends it to mean. The Kalani Kapu affidavit establishes that the phrase was used to refer to any male relative of the person using the phrase and that the phrase was most commonly used to refer to an uncle or male cousin, rather than a relative with a direct lineal relationship to the person using the word.

. . . .

There is a break in the chain of title to [MLC] as there is no proof of ownership of Apana 1 in MOMONA and no competent proof that APAA was related to MOMONA. Also, it is clear that APAA was survived by his wife, KEKUE, aka KEKUA, and that she [is] described as the owner of the property in the survey notes pertaining to Apana 1 after APAA's death. Exhibit B of the Kalani Kapu affidavit clearly refutes any claim that Apaa gave the property to anyone named MOMONA at any time. The motion should be denied on this point alone, as there is clearly a question of significant fact.

Since the facts presented by [MLC] do not support a claim of paper title, the Defendant Kapu does not have to make any showing. Accordingly, Summary Judgment should be entered on behalf of the Defendant Kapu and the Complaint should be dismissed. In the alternative, there are factual issues concerning the ownership of the land at the time that the lease was signed, the meaning of the word "MAKUAKANE", the identification of the lands referred to in the deed, and the relationship of Apaa to Momona, the intent of the parties at the time the lease and deed were signed, all of which preclude the entry of summary judgment as requested.

Keʻeaumoku supported the Opposition Memorandum with an April 11, 2003 Affidavit of Kalani Kapu (Kalani's Affidavit) which stated, in relevant part:

1. I am a native Hawaiian and a kumu hula [14] and I understand, speak, read and write the Hawaiian language. I am a brother of Keʻeaumoku Kapu.

2. I have reviewed the original Hawaiian version of the [1872] Lease. . . .

3. I have compared the original version of the [1872] Lease to the Exhibit 1 [October 11, 1990, Frazier] translation.

. . . .

5. The . . . text [of the 1872 Lease] contains the Hawaiian word "MAKUAK-ANE" which Frances N. Frazier translates to mean "father".

6. The translation by Ms. Frazier is incorrect, in that "MAKUAKANE" includes male relatives, such as uncles or cousins.

7. The term "MAKUAKANE" was not normally used to identify relatives in a direct line of descent, such as grandfathers, great-grandfathers, fathers, sons, grandsons, etc., as there were specific words used to refer to those persons.

8. It is inappropriate to translate the term "MAKUAKANE", as used in the . . . [1872] Lease to mean the father of Momona.

9. I have conducted genealogical research concerning the person identified as Apaa in Land Court Award 6507.

10. My research shows that Apaa was married to Kekue, also known as Kekua, and that he had only one son, Kamokulewa. (Exhibit B).[15] There is no record to support the contention that he also had a son named Momona.

11. Kekue and Kamokulewa survived Apaa (Exhibit C, FT 56, v.5).[16]

---

14. A "kumu hula" is a hula teacher. Pukui & Elbert, *supra* note 2, at 182.

15. This information is presented in Exhibit "C", not "B", of the Affidavit.

16. Exhibit C is a copy of a typewritten document containing statements about what appears to be sections of land. It states, in relevant part:

No. 6507 Apaa

12. Although there were three Apana's [sic] identified in Land Commission Award 6507, only Apana 1 is mentioned in the Exhibit 1 [October 11, 1990, Frazier translation of the 1872] lease.[17]

13. I have conducted traditional research concerning the geneology of Ke'eaumoku Kapu which shows the following to be true:

(a) Apaa was married to Kekue, also known as Kekua (Exhibits B, C)

(b) Kekue and Apaa had one son, Kamokulewa (Exhibit C)

(c) Kekue survived Apaa (Exhibit B)

(c)[18] [sic] Namauu succeeded to the interest of Apaa (FT 20.7 # 6606, Puali, Ex. D)

(d) Namauu and his wife, Kealo, had one daughter, Tereka, who died with no issue. (Exhibit E)

(e) Kealo and Namauu, did not survive Tereka (Exhibit E)

(f) Tereka's interest went to her two surviving uncles, Kapili and Puali (Exhibit E)

(g) Their interest went to Koinui (w) and Kaiwi (k) by intestate succession (Exhibit E)

(g) [sic] Their interest went to Koinui (w) and Kaiwi (k) by intestate succession (Exhibit C)

(h) When Koinui died, her interest passed to Kaiwi by intestate succession.

(i) Kaiwi married Kapololu(w) and they had one daughter, named Keanaai (Exhibit D)

(j) Keanaai married Manuia Kekai (k), (Exhibit E)

(k) Keanaai and Manuia Kekai had a daughter, named Julia Kekai (Exhibit F)[19]

(*l*) Julia Kekai married Harry (Hale) Kapu and they had a son named John Paul Kekai Kapu[,] aka Paul Kekai Kapu, (Exhibit G).[20]

(m) John Paul Kekai Kapu married Barbara Hao (Exhibit H).[21]

(n) Ke'eaumoku Kapu is the son of John Paul Kekai Kapu and Barbara Hao (Exhibit I).

(*o*) Lineal descent from Olala (k) and Kanawakiwali (k) is verified in Exhibit J.[22]

14. I have conducted traditional research concerning the geneology [sic] of Ke'eaumoku Kapu which shows the following to be true:

(a) Kekue, also known as Kekua, the wife of Apaa, survived Apaa.

(b) Kekue married Keawe Haia after the death of Apaa.

(c) Keawe Haia survived Kekue.

(d) Upon the death of Keawe Haia, his interest in the property passed by intestate succession to his brother Haia Kekai who had one son named John Manuia Kekai.

*Puali* sworn He has seen 5 sections at Kooka, this interest has been from Mr. Hoapili. Apaa *is dead, his son Kamokulewa is his heir*, also his wife Kekue. No one has objected and here are the boundaries....
We note that Exhibit C states only that "[Apaa's] son Kamokulewa is his heir", not that Kamokulewa is Apaa's only son.

17. The November 6, 1872 Lease involves 'āpana 2 and 3. It does not mention 'āpana 1.

18. The alphabetized listing of item 13 is incorrect in the original, from this point to the end.

19. Exhibit F is a death certificate for a Julia Kekai, listing Manuia Kekai as her husband, and Kamaunu and "Haa Heo" as her parents.

20. Exhibit G is a death certificate for Julia Kapu, listing Manuwia [sic] Kekai and Julia Namaunu as her parents. Exhibit H is a birth certificate for Paul Kekai Kapu, listing Harry Kapu and Julia Manuia as his parents.

21. Exhibit H does not mention Barbara Hao. Exhibit I, however, lists Paul Kekai Kapu as the "[full] Name of Father", and Barbara Mapuana Hao as the "[f]ull Maiden Name of Mother", of "Jonah Keeaumoku Kapu." "Barbara Kapu" was the signature under the caption entitled "Signature of Parent or Other Informant."

22. Exhibit J is also a copy of a birth certificate for "Jonah Keeaumoku Kapu." Exhibit K is a copy of a memorandum "From: Kana'i Kapeliela, Cultural Specialist, Burial Sites Program, State Historic Preservation Division" and refers to gravesites on TMK (Tax Map Key) 4–6–21, parcels 004, ... TMK (2)4–6–21–4 refers to 'āpana 1.

(e) When Haia Kekai died, his interest in the property passed by intestate succession to his son, John Manuia Kekai.

(f) Upon the death of John Manuia Kekai, his interest in the property passed by intestate succession to his daughter, Julia Kealani Kapu.

(g) Julia Kealani Kapu married Hale Kapu, also known as Harry P. Kapu.

(h) Upon the death of Julia Kealani Kapu, her interest in the property passed by intestate succession to Paul Kekai Kapu.

(i) John Paul Kekai Kapu married Barbara Hao (Exhibit H).[23]

(j) Ke'eaumoku Kapu is the son of John Paul Kekai Kapu and Barbara Hao (Exhibit H).[24]

(k) John Paul Kekai Kapu, has transferred his interest in the property to his son, Ke'eaumoku Kapu.. [sic] [25]

15. All of the information and facts which I have recited herein is [sic] supported by the oral history of our family.

(Footnotes added.) Our examination leaves open the question whether Exhibit E supports the allegations stated in sub-paragraphs 13(d) and (e).

Exhibit B, referred to in part 10, above, is identified as follows:

I, JOLYN G. TAMURA, State Archivist of the State of Hawaii, do hereby certify that the attached documents are a true and correct copy of the Survey of Land Commission Award 6507, Royal Patent No.

23. *Supra* note 20.

24. *Supra* note 21.

25. The record does not indicate how John Paul Kekai Kapu transferred the property interest to Ke'eaumoku.

26. Translation by Jason Achiu, Hawai'i State Archives 5/2002.

27. Although the boundaries of the first parcel (parcel 1) described in the Survey of Land Commission Award 6507, Royal Patent No. 3457 Series 294 Survey Notes (Survey Notes) and the boundaries of 'āpana 1 described in Land Commission Award 6507/Royal Patent 3457 (LCA 6507) are the same, the total acreage of parcel 1

3457, with English translation, from Survey Notes [Series 294], Department of Land and Natural Resources on file in the STATE ARCHIVES, at Honolulu, State of Hawaii.

This survey describes the boundaries of three kuleana land parcels belonging to Apaa, L.C.A. 6507, situated at Ko'okā, Lahaina, Maui. The English translation of the survey [26] of the first parcel states, in relevant part:

Series 294: Survey Notes,

R.P. 3457

Survey of a kuleana land belonging to Kekua, the widow of Apaa. Apaa is the awardee of L.C.A. 6507, situate in the ahupua'a of Ko'oka, at Lahaina, Maui.

Commencing at the West corner of this parcel, where it adjoins with Ku'ia and the land belonging to Kaia, and running

| South | 23½ | East | 5.35 | chains along Kaia's land |
| North | 63¼ | East | 5.05 | chains along Punau's land |
| North | 39 | West | 1.92 | chains along the bank of Pi'ilani ditch of Ku'ia |
| North | 15⅞ | West | 4.31 | chains along the bank of Pi'ilani ditch of Ku'ia |
| North | 30½ | East | 2.27 | chains along the bank of Pi'ilani ditch of Ku'ia |
| South | 85⅞ | West | 2.24 | chains along the bank of Pi'ilani ditch of Ku'ia |
| South | 53½ | West | 1.78 | chains along the bank of Pi'ilani ditch of Ku'ia |
| South | 19¼ | West | 4.14 | chains along the bank of Pi'ilani ditch of Ku'ia and to the point of origin. |

Containing 3 acres, 2 roods & 21 rods.

(Spelling as in the original.) The second parcel contains "1 acre, 1 rood & 3 rods." The third parcel contains "1 rood & 22 rods." The total of these three parcels is 5 acres, 1 rood and 6 rods.[27]

is stated as 3 acres, 2 roods, and 21 rods, while the total acreage listed for 'āpana 1 is 2 acres, 2 roods, and 21 rods-an exactly one acre difference. A "court is permitted to draw only those inferences of which the evidence is reasonably susceptible...." *Pioneer Mill Co., Ltd. v. Dow*, 90 Hawai'i 289, 296, 978 P.2d 727, 733 (1999) (citing *Waimea Falls Park, Inc. v. Brown*, 6 Haw. App. 83, 97, 712 P.2d 1136, 1146 (1985)). It is reasonable to infer that a typographical error occurred within the Palapala Sila Nui document, and the correct acreage for 'āpana 1 is 3 acres, 2 roods, and 21 rods. This inference is based on the statement that the total acreage for LCA 6507 is 5 acres, 1 rood, and 6 rods, and on the statement that the total acreage in the Survey Notes for 'āpana 1, 2, and 3 is also 5 acres 1 rood, and 6 rods.

In opposing MLC's genealogical tree, Ke'eaumoku presented three conflicting genealogical trees. The first started with Namauu. The second started with Kekue and passed through her surviving husband, Keawe Haia. The third started with Kamokulewa. More specifically, the three alternate theories of title to 'āpana 1 are as follows:

(1) *from Apaa to Namauu:*

Apaa

Heir = Namauu (successor land agent)

Heir = Tereka (w) (Namauu's daughter)

Heirs = Kapili (k) and Puali (k) (Tereka's surviving uncles)

Heirs = Koinui (w) and Kaiwi (k) [no relationship stated]

Heir = Kaiwi (k) (upon death of Koinui)

Heir = Keanaai (w) (Kaiwi's daughter)

Heir = Julia Kekai (w) (Keanaai's daughter)

Heir = John Paul Kekai Kapu (aka Paul Kekai Kapu, Julia's son)

Heir = Ke'eaumoku Kapu ["transferred" interest from John Paul]

(2) *from Apaa to his widow Keku[e]:* [28]

Apaa

Heir = Widow [29]

Kekue

Heir = Keawe Haia (Kekue's husband after death of Apaa)

Heir = Haia Kekai (Keawe Haia's brother)

Heir = John Manuia Kekai (Haia Kekai's son)

Heir = Julia Kealani [Kekai] Kapu (John Manuia Kekai's daughter)

Heir = [John] Paul Kekai Kapu [Julia's son, per above]

Heir = Ke'eaumoku Kapu ("transferred" interest from John Paul)

(3) *From Apaa to his son Kamokulewa:*

Apaa

Heir = Kamokulewa (Apaa's son by Kekue)

Heir [30] = ?

MLC argues, in response to Ke'eaumoku's first genealogical tree starting with Namauu, that: a) there is no evidence that Namauu inherited 'āpana 1 from Apaa; and b) a Land Commission Awardee's title descended to his heirs, not a successor King's agent.

MLC argues, in response to Ke'eaumoku's second genealogical tree starting with Kekue and passing through Keawe Haia, that: a) Ke'eaumoku's evidence is inadmissible hearsay, not having been made on personal knowledge; and b) Ke'eaumoku identifies Kamokulewa as Apaa's heir and therefore Kekue could not inherit since she had a living son when Apaa died.

In response to Ke'eaumoku's third genealogical tree, starting with Kamokulewa, MLC

---

28. According to Ke'eaumoku's brother Kalani Kapu, "Kekue" was also known as "Kekua".

29. Nothing in the record shows how Kekue received 'āpana 1 from Apaa.

30. Nothing in the record explains how Ke'eaumoku or his ancestors received the land from Kamokulewa.

argues that: a) Keʻeaumoku's evidence is inadmissible hearsay; b) Kamokulewa is a stranger to Keʻeaumoku's genealogical tree because there is no evidence to show that Kekue received ʻāpana 1 from Kamokulewa; and c) Momona identified himself as heir to Apaa, whether son or other male relative, and there is no admissible evidence to support a claim that Kamokulewa was also an heir.

After hearing arguments on April 23, 2003, the court entered the May 7, 2003 order granting the SJ Motion which stated, in relevant part:

> The record shows that there is an absence of evidence to support the claims of July Simeona and Keʻeaumoku Kapu, that there is no genuine issue as to any material fact relative to [MLC's] title to the land, and that [MLC] is entitled to judgment as a matter of law. .

On May 15, 2003, the court entered its Final Judgment

> in favor of [MLC] and against all named Defendants, their heirs and assigns, and all unknown persons claiming an interest in said real property, including July Simeona and Keʻeaumoku Kapu, that [MLC] is the owner in fee simple of Apana 1 of Land Commission Award 6507, Royal Patent 3457, to Apaa, situated at Kooka, Lahaina, Maui, Hawaii, within TMK (2) 4–6–21–4.

Keʻeaumoku timely appealed on June 9, 2003. The appeal was assigned to this court on February 9, 2004.

## STANDARD OF REVIEW

■ We review *de novo* a circuit court's grant or denial of a motion for summary judgment. *Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Hawaiʻi 213, 221, 11 P.3d 1, 9 (2000). Accordingly,

> [o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary

judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Iddings v. Mee–Lee*, 82 Hawaiʻi 1, 5, 919 P.2d 263, 267 (1996). *See also* Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (2005).[31]

HRCP Rule 56(e) (2005) states:

> Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

■ On a motion for summary judgment, "[a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Crichfield v. Grand Wailea Co.*, 93 Hawaiʻi 477, 482–83, 6 P.3d 349, 354–55 (2000) (quoting *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982)). "[A] 'genuine issue as to any material fact' … under a conflict in the affidavits as to a particular matter must be of such a nature

---

**31.** Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (2004) provides, in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

that it would affect the result." *Richards v. Midkiff,* 48 Haw. 32, 39, 396 P.2d 49, 54 (1964).

■ In reviewing a circuit court's grant or denial of a motion for summary judgment, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion." *Crichfield,* 93 Hawai'i at 483, 6 P.3d at 355. "[A]ny doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party." *GECC Fin. Corp. v. Jaffarian,* 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App.1995).

■ Similarly,

[c]ourts will treat the documents submitted in support of a motion for summary judgment differently from those in opposition. Although they carefully scrutinize the materials submitted by the moving party to ensure compliance with the requirements of Rule 56(e), HRCP (1990), the courts are more indulgent towards the materials submitted by the non-moving party. This is because of the drastic nature of summary judgment proceedings, which should not become a substitute for existing methods of determining factual issues.

Affidavits in support of a summary judgment motion are scrutinized to determine whether the facts they aver are admissible at trial and are made on the personal knowledge of the affiant. Also, ultimate or conclusory facts or conclusions of law are not to be utilized in a summary judgment affidavit.

*Miller v. Manuel,* 9 Haw.App. 56, 66, 828 P.2d 286, 292 (1991) (citations omitted). "Once the movant has satisfied the initial burden of showing that there is no genuine issue of material fact, the opposing party must come forward, through affidavit or other evidence, with specific facts showing that there is a genuine issue of material fact." *Id.* at 65, 828 P.2d at 292. If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment as a matter of law. *Hall v. State,* 7 Haw.App. 274, 284, 756 P.2d 1048, 1055 (1988); *see also* HRCP Rule 56(e).[32]

■ In deciding a motion for summary judgment, a circuit court must keep an important distinction in mind:

A judge ruling on a motion for summary judgment cannot summarily try the facts; his role is limited to applying the law to the facts that have been established by the litigants' papers. Therefore, a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition or because it appears that the adversary is unlikely to prevail at trial. This is true even though both parties move for summary judgment. Therefore, if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper.

*Kajiya v. Dep't of Water Supply,* 2 Haw.App. 221, 224, 629 P.2d 635, 638–39 (1981) (quoting 10 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2725 (1973)). In other words, "summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." *Miller,*

---

32. Hawai'i Rules of Civil Procedure Rule 56(e) provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

9 Haw.App. at 65–66, 828 P.2d at 292 (internal quotation marks and citation omitted).

## POINTS OF ERROR

In the opening brief, Keʻeaumoku contends that the record reflects the following:

A. Question of fact regarding the meaning of language in the MOMONA [1872 Lease].

B. Question of fact regarding whether MOMONA was the son of APAA.

C. Question of fact regarding whether MOMONA owned Apana 1 of LCA 6507 at the time the 1892 Deed was signed.

D. Question of fact regarding elements of [MLC's] adverse possession claim.[33]

33. MLC did not base its March 24, 2003 summary judgment motion, and there is no indication that the court based its May 7, 2003 Order Granting Plaintiff's Summary Judgment Motion, on MLC's adverse possession claim.

34. *Supra* note 4.

35. The Hawaiian language does not contain the letter "s", instead using other ways to signal a plural noun. E.g., the plural article nā, preced-

(Footnote added). Keʻeaumoku asserts that "there is conflicting evidence as to the meaning of the [1872] Lease, as well as other evidence which shows that [Momona] was not the son of [Apaa]."

## DISCUSSION

On December 16, 1856, King Kamehameha IV signed a "Palapala Sila Nui"[34] (PSN) concerning lands hereafter described as ʻāpana 1, ʻāpana 2, and ʻāpana 3, to Apaa. This PSN describes the boundaries of each of the three ʻāpana[35] and contains a surveyor's sketch of each of the three ʻāpana. This PSN is written entirely in the Hawaiian language and states, in relevant part:

ing a noun, generally signals a plural usage. Samuel H. Elbert, *Spoken Hawaiian* 19 (1970); the plural article "mau", following certain (initial) "k" words, also signaled a plural usage. *Id.* at 82. Although some individuals used "s" to pluralize Hawaiian words in land documents, we choose to use, as appropriate and possible, the proper spelling of such nouns, i.e., without the letter "s".

PALAPALA SILA NUI

A he Alii, mamuli o ha Olelo a ha poe Hoona Kuleana

No ka Mea[37], Ua hooholo na Luna Hoona i na kumu kuleana aina i ka olelo, he kuleana oiaio ko APAA (Kuleana Helu 6507)

. . . .

Nolaila, ma keia PALAPALA SILA NUI, ke hoike aku nei o.............
ke Alii Nui a ke Akua i kona lokomaikai i hoonoho ai maluna o ko Hawaii
Pae Aina, i na kanaka a pau, i keia la nona iho, a no kona mau hope Alii
ua hoolilo, a ua haawi aku oia, ma ke Ano Alodio ia
 Apaa

i kela wahi a pau loa ma Kooka, Lahaina
 ma ka Mokupuni o Maui penei na mokuna:
 E hoomaka ana ma ke kihi Komohana o keia apana, kahi i pili ai oia me
kaia a me ka aipa o keia, a e holo ana

| | | | | |
|---|---|---|---|---|
| Hema[38] | 23 ½ | Hik[39] | 5.35 | kaul e pili ana me Kaia |
| Akau[40] | 63 1/4 | Hik | .5.05 | " " " Punau |
| Akau | 39 | Kom[41] | 1.92 | " ma kapa o ka auwau Piilani o Kaia |
| Akau | 15 3/4 | Kom | 4.31 | " " " " " |
| Akau | 30 ½ | Hik | 2.27 | " " " " " |
| Hema | 85 3/4 | Kom | 2.24 | " " " " " |
| Hema | 53 ½ | Kom | 1.78 | " " " " " |
| Hema | 19 1/4 | Kom | 4.14 | " " " " " |

a hiki i kahi i hoomaka ai 2 Eka[42] 2 Ruda[43] 21 Roda[44]

Apana 2 E hoomaka ana ma ke kihi Akau o keia a e holo

| | | | | |
|---|---|---|---|---|
| Hema | 58 3/4 | Kom | 5.61 | kaul e pili ana me Namanu |
| Hema | 59 | Hik | 3.61 | " " " |
| Akau | 44 ½ | Hik | 3.34 | " " Polanui |
| Akau | 17 1/4 | Kom | 2.37 | " " Olelo |

a hiki i kahi i hoomaka ai 1 Eka 1 Ruda 3 Roda

Apana 3 E hoomaka ana ma ke kihi Akau o keia a e holo

| | | | | |
|---|---|---|---|---|
| Hema | 52 | Kom | 2.89 | kaul e pili ana me Manu |
| Hema | 78 3/4 | Hik | 2.00 | " " Namanu |
| Akau | 88 1/3 | Hik | 1.58 | " " Hoonaulu |
| Akau | 30 ½ | Kom | 2.47 | " " Namanu |

a hiki i kahi i hoomaka ai 1 Ruda 22 Roda

Maloko o ........keia mau.............apana 5.... Eka 1 Ruda 6 Roda[45]....
a oi iki aku, a emi iki mai paha. Ua koe nae i ke Aupuni na mina minerela a me
na metela a pau.

. . . .

. . . .

 (Sgd) KAMEHAMEHA
NA KA MOI:
 Ke Kuhina Kalaiaina

**Editor's note:** The preceding image contains the references
for footnotes: 36, 37, 38, 39, 40, 41, 42, 43, 44, 45

(Footnotes added.) This original Hawaiian language version of the PSN contains the

**36.** "Helu" means "[t]o count, number, compute, take a census"; also, "to chant a list of names, as of genealogy; including, counting, enumeration, census, ... statistics." Pukui & Elbert, *supra* note 2, at 65.

**37.** "No ... ka mea, kuleana" is translated as "ownership". Pukui & Elbert, *supra* note 2, at 494.

only description of the PSN in the record.

This appeal involves only 'āpana 1. MLC's chain of title to 'āpana 1 is explained in the declaration of their expert, Colleen H. Uahinui, quoted in relevant part as follows:

APAA (k) filed his claim for Apana 1 of Land Commission Award 6507 in 1848.

Apana 1 of Land Commission Award 6507, Royal Patent 3457, was awarded in 1852 to APAA (k).

There is no Bureau of Conveyances record of a conveyance by, and no judicial determination of the heirs or probate of the estate of, APAA (k).

In Lease dated November 6, 1872, recorded in Book 35, Page 474, a true and correct copy of a translation of which is attached hereto as EXHIBIT 1, Momona recited that APAA (k) was his father.

By Deed dated September 20, 1892, recorded in Book 135, Page 457, Momona conveyed ['āpana 1, 2 and 3] to Paul Isenberg and C.F. Horner.

By Deed dated June 29, 1895, recorded in Book 154, Page 222, Paul Isenberg and C.F. Horner conveyed ['āpana 1, 2 and 3] to Pioneer Mill Company, Limited.

By Deed dated January 16, 2001, recorded as Document No. 2001–006059, Pioneer Mill Company, Limited conveyed ['āpana 1, 2 and 3] to Makila Land Co., LLC.

### 1.

We first address whether MLC satisfied its initial burden of presenting admissible evidence of its paper title to 'āpana 1.

Ke'eaumoku argues that the 1872 Lease is not admissible evidence because it does not make any reference to 'āpana 1 and is therefore not relevant. We disagree. Momona's statement describing his relationship to Apaa and an explanation of how 'āpana 2 and 3 passed from Apaa to Momona is relevant to the dispute regarding 'āpana 1 because it is evidence that Apaa conveyed 'āpana 1 to Momona.

Ke'eaumoku further argues that to properly admit the 1872 Lease into evidence, MLC must first establish evidence *aliunde* of the relationship between Apaa and Momona. *Mist v. Kapiolani Estate, Ltd.*, 13 Haw. 523 (1901). *See also Drummond v. Makaena*, 30 Haw. 116 (1927). Ke'eaumoku fails to consider the following parts of the Hawaii Rules of Evidence (HRE), Chapter 626, HRS (1993):

Rule 803. Hearsay exceptions; availability of declarant immaterial. The following are not excluded by the hearsay rule, . . . :

. . . .

(b) Other exceptions.

. . . .

(15) Statements in documents affecting an interest in property. A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless the circumstances indicate lack of trustworthiness.

---

38. "Hema" means "South". Pukui & Elbert, *supra* note 2, at 66.

39. "Hik" is an abbreviation for *"hikina, east."* Pukui & Elbert, *supra* note 2, at 68.

40. "Akau" means "North". Pukui & Elbert, *supra* note 2, at 13.

41. "Kom" is an abbreviation for *"komohana, west."* Pukui & Elbert, *supra* note 2, at 164.

42. "Eka" denotes "acre". Pukui & Elbert, *supra* note 2, at 39.

43. "All loan words from English sometimes spelled with initial *r-* are entered under *l-*. For

example: *raisi*, see *laiki*, rice; *ropi*, see *lopi*, rope; *rumi*, see *lumi*, room." Pukui & Elbert, *supra* note 2, at 360. Similarly, "[a]ll loan words from English sometimes spelled with initial *d-* are entered under *k-*. For example: *dala*, see *kālā*, dollar; *dia*, see *kia*, deer; diabolo, see *kiapolo*, devil." Pukui & Elbert, *supra* note 2, at 35. Thus, "ruda" can also be expressed as "luka" which is defined as "[r]ood, in surveying." Pukui & Elbert, *supra* note 2, at 210.

44. Using the same construction as in "ruda", "roda" can also be "loka", which is defined as "[r]od". Pukui & Elbert, *supra* note 2.

45. *Supra* note 27.

(16) Statements in ancient documents. Statements in a document in existence twenty years or more the authenticity of which is established.

The statement by Momona in the 1872 Lease that [Momona] "received this parcel [sic] of land from Apaa, my own father" is in a document affecting an interest in 'āpana 2 and 3 and the statement asserted Momona's right to transfer the interest in that property. Additionally, the document was dated more than twenty years prior to the initiation of this case, and Ke'eaumoku does not dispute the authenticity of the document itself. In light of HRE Rule 803(b)(15) and (16), the document is admissible as an exception to the hearsay rule.

 "Documents that are plainly inadmissible in evidence and are unsworn, not properly sworn to, and/or uncertified cannot be considered upon a summary judgment motion." *Pioneer Mill Co., Ltd. v. Dow,* 90 Hawai'i 289, 297, 978 P.2d 727, 735 (1999). Citing this precedent, Ke'eaumoku further argues that even if the 1872 Lease is admitted into evidence, the October 11, 1990 Frazier translation of the 1872 Lease should not have been considered by the court because a signed form of the document identifying the translation was not filed until April 24, 2003, "[t]he day after the hearing on the motion and the ruling of the Circuit Court granting summary judgment to MAKILA[.]"[46] This argument has no merit. The 1872 Lease translation indicated that it was "[t]ranslated by Frances N. Frazier truly and correctly to the best of my ability" and was signed by Frances N. Frazier. Furthermore, the record shows that the Frances N. Frazier Declaration (Frazier Declaration), dated April 19, 2003, was filed in the circuit court on April 24, 2003, after the April 23, 2003 hearing, but prior to the May 7, 2003 Order and May 15, 2003 Judgment.

 The record shows that Momona received 'āpana 2 and 3 from Apaa, but does not reveal whether or not Momona received 'āpana 1 from Apaa. The record also shows

that Momona (a) was the lessor of 'āpana 2 and 3 and (b) deeded the land "whose boundaries are described in Royal Patent No. 3457, Land Commission Award No. 6507, containing 5 acres, 1 rood and 6 rods[,]" to Paul Isenberg and C.F. Horner. A "court is permitted to draw only those inferences of which the evidence is reasonably susceptible and it may not resort to speculation." *Id.* at 733, (citing *Waimea Falls Park, Inc. v. Brown,* 6 Haw.App. 83, 97, 712 P.2d 1136, 1146 (1985)). Here, the question is whether it is reasonable to infer that 'āpana 1 was also "received from Apaa" by Momona. No statement was made to that effect in either the 1872 Lease[47] from Momona, which covered only 'āpana 2 and 'āpana 3, or the 1892 Deed from Momona, which transferred land with a description matching 'āpana 1, 2, and 3 combined.

MLC presented evidence that Momona was Apaa's son and that Apaa died intestate. The laws of intestacy at that time provided that a decedent's heir(s) was (were) his issue.[48] Accepting that Momona (1) was Apaa's son; (2) received 'āpana 2 and 3 of Royal Patent No. 3457/LCA 6507 from Apaa; and (3) included 'āpana 1 in the Deed transferring his interest in lands in Royal Patent No. 3457/LCA 6507, it is reasonable to infer that Momona also received 'āpana 1 from Apaa.

2.

We next consider whether Ke'eaumoku established a genuine issue of material fact regarding the ownership of 'āpana 1 based on the relationship between Apaa and Momona. In the 1872 Lease, Momona states that he received lands from Apaa, his "makuakane". Ke'eaumoku argues that, if the Frazier translations are considered by the court, then Frazier incorrectly translated the term "makuakane" as "my own father". In support of this argument, Ke'eaumoku submits Kalani's Affidavit. Beyond his declaration that he is a hula teacher, Kalani does not provide extrinsic support for his contention that he understand[s], speak[s], read[s], and write[s]

46. The record on appeal does not include a copy of a transcript of the April 23, 2003 hearing.

47. *Supra* note 17.

48. *Supra* note 13.

Hawaiian.[49] Nonetheless, neither the record on appeal nor MLC contradicts Kalani's assertions concerning his ability to translate from Hawaiian to English. Since we view the evidence in the light most favorable to Ke'eaumoku, *Crichfield* at 483, 6 P.3d at 355, we accept Kalani's statements that he does understand, speak, read, and write Hawaiian.

## KE'EAUMOKU'S GENEALOGICAL TREE NO. 3

■ According to Ke'eaumoku, Kamokulewa was Apaa's son and heir. Ke'eaumoku offers Exhibit C[50] attached to Kalani's Affidavit, a copy of a typewritten document which appears to be a description of sections of land. Exhibit C refers to "No. 6507 Apaa" and states that "Apaa is dead, his son Kamokulewa is his heir, also his wife Kekue. No one has objected and here are the boundaries." Ke'eaumoku declares that Exhibit C is a copy of "[f]oreign testimony".

HRE Rule 901 (1993) states, in relevant part:

Requirement of authentication or identification. (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples . . . :

. . . .

(8) Ancient documents or data compilation. Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity[.]

HRE Rule 902 states, in relevant part:

Self-authentication. Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

(1) Domestic public documents under seal. A document bearing a seal purporting to be that of the United States, or of any state, . . . , department, officer, or agency thereof, and a signature purporting to be an attestation or execution.

Exhibit C is not authenticated by a citation to a verified source.[51] Without such certification, the document is hearsay and does not fall under any exception. Applying HRE Rules 801, 901, and 902, Ke'eaumoku's Exhibit C is inadmissible and cannot be considered by this court.

■ Kalani's Affidavit stating that Kamokulewa was the son of Apaa and Kekue is, however, admissible to show family relationships. HRE Rule 804 (1993) states, in relevant part:

Hearsay exceptions; declarant unavailable.

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:

. . . .

(4) Is unable to be present . . . because of death. . . .

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(4) Statement of personal or family history. (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the mat-

---

49. In contrast, MLC's Hawaiian language expert, in the Frances N. Frazier Declaration filed on April 24, 2003, provided an extensive listing of Frazier's educational achievements and experience in translating from Hawaiian to English.

50. *Supra* note 16.

51. Exhibits 2, 3, 4, and 5 attached to the Colleen H. Uahinui Declaration provided by MLC are accompanied by signed certifications by "Susan Shaner, State Archivist of the Public Archives of the State of Hawaii" stating that each "document is a true and correct copy of the testimony" pages from "Foreign Testimony", "Board of Commissioners to Quiet Land Titles." In contrast, Ke'eaumoku's Exhibit C was not certified and is not self-authenticating.

ter stated; or (B) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage.

Kalani's Affidavit establishes Kamokulewa as a possible rival heir to Momona for 'āpana 1. Ke'eaumoku does not, however, provide any evidence to show how he would have received land from Kamokulewa. Ke'eaumoku's claim of ownership through Kamokulewa therefore fails.

In this case, both Ke'eaumoku and MLC contend that Apaa had a son who was heir to Apaa, but they disagree on the identity of that son. However, as discussed above, the Survey Notes identified Keku[e] as the owner of 'āpana 1, and Ke'eaumoku may argue his right to 'āpana 1 by showing his genealogical descent from Kekue. HRE Rule 804 (1993).

MLC contends that Ke'eaumoku's Exhibit C establishes Kamokulewa as the son and heir of Apaa, and that Apaa's widow Kekue therefore cannot be Apaa's heir. Because we have determined that Exhibit C is not admissible, this argument is moot.

## KE'EAUMOKU'S GENEALOGICAL TREE NO. 2

██ Ke'eaumoku's assertion, supported by the Survey of Land Commission Award 6507, Royal Patent No. 3457, with English translation, from Survey Notes [Series 294], Department of Land and Natural Resources on file in the State of Hawai'i Archives (Survey Notes), that Apaa's widow Keku[e] owned 'āpana 1 directly contradicts MLC's contention that Momona owned the land, 'āpana 1, that he conveyed to Isenberg and Horner. We must review the evidence and draw inferences in the light most favorable to Ke'eaumoku, *Crichfield*, 93 Hawai'i at 483, 6 P.3d at 355. If Momona was Apaa's son, all Apaa's lands could have descended to him by intestacy, as MLC argues. However, Ke'eaumoku presented evidence by Survey Notes that land matching the description of

'āpana 1 was owned by Kekue, and HRE Rule 803(b)(15) and (16) allow admission of such evidence as an exception to the hearsay rule for the same reasons that the 1872 Lease is admissible. There is a genuine issue of material fact because the inference that Momona also received 'āpana 1 from Apaa is directly contradicted. This precludes the granting of summary judgment. *Crichfield*, 93 Hawai'i at 482–83, 6 P.3d at 354–55.

Ke'eaumoku's support for his claim of genealogical descent from Kekue is Kalani's Affidavit, which in turn is "supported by the oral history of [the Kapu] family." While "an affidavit consisting of inadmissible hearsay cannot serve as a basis for awarding or denying summary judgment[,]" *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 397 n. 2, 772 P.2d 1187, 1190 n. 2. (internal citations omitted), family oral history can reasonably be viewed as an exception to the hearsay rule under HRE Rule 804. These statements allege Ke'eaumoku's genealogical descent from Kekue, and present Ke'eaumoku as a viable claimant with standing to contest MLC's assertion of ownership of 'āpana 1.

## KE'EAUMOKU'S GENEALOGICAL TREE NO. 1

Ke'eaumoku also asserts an interest in 'āpana 1 by descent from a person named Namauu. This assertion is without merit. In response to Ke'eaumoku's genealogical tree "(1)" alleging that title to 'āpana 1 went from Apaa to Namauu, and ultimately to Ke'eaumoku, MLC presented the following evidence to show that 'āpana 1 could not descend to Namauu because Namauu was Apaa's successor "luna [52] or headman (King's Agent)" and not his heir.

First, MLC presented "Land Commission Testimonies, Series 287, Board of Commissioners to Quiet Land Titles" (LCT 287) [53] from the State of Hawai'i Archives (State Archives), testimony on Land Commission Award (LCA) No. 6606 to Puali, page 20 of

---

**52.** A "luna" was the land agent for the King, and land grants went to heirs of the awardee-they did not revert back to the King. Chinen, *supra* note 4, at 55.

**53.** The testimony is transcribed into written form by unidentified persons and the date of the testimony is omitted.

Foreign Testimony, volume 7, which states, in relevant part: "[Puali] had them from Apaa, once head man of Kooka now dead, he gave them to him in 1832—and he has held them undisputed ever since. Namauu elua is now head man there as Kings [sic] Agent, to whom belongs Poalima."

Second, MLC offers LCT 287 testimony on LCA No. 6800 to Kekukahiko, pages 51–52 of Foreign Testimony, volume 7, State Archives, which states, in relevant part:

[Kekukahiko] [received] these lands from Apaa in the ancient days of Hoapili, and has possessed the kula land in peace ever since. But the luna Apaa, who gave him the Kula land, took it from him soon after, and he has held it ever since allowing [Kekukahiko] however to dwell on it. Apaa and his successor Namauu Ehu, have now enjoyed the fruit of this kula for 4 or 5 years. Apaa took it away by the right of his lunaship.

Third, MLC offers LCT 287 testimony on LCA No. 4878–V to Kaia, pages 36–37 of Foreign Testimony, volume 7, State Archives, which states, in relevant part:

I know all the lands of [Kaia]. They consist of one piece of Kula, and 26 lois [54], which is in "Kooka," Lahaina. This land came to [Kaia] in 1837 from Apaa the head man of Kooka, and he has had the undisturbed possession of the same ever since. The head man, Apaa, took however some lois from him as did the present head man Namauu Ehu, but still he has 26 lois left.

Fourth, MLC offers LCT 287 testimony on LCA No. 4878–I to Kupalii, pages 31–32 of Foreign Testimony, volume 7, State Archives, which states, in relevant part:

[Kupalii] [received] these lands from Namauu Ehu with the exception of the Kula, which he [received] from Apaa.

The Kula came to him during the days of Hoapili previous to 1839, and he has held this ever since in peace.

The House lot and Kalo land he (received) in 1845, and has had quiet possession of them ever since. Namauu Ehu was the luna of the land. The King is the great Lord of the land.

These testimonies identify Namauu as Apaa's successor as "luna" or King's Agent. HRE Rule 803(b)(16). Namauu, as the King's Agent, could not inherit the contested property because Land Court Award/Royal Patent Lands descended to the heirs of the awardee, not successor land agents. Statutory Laws of His Majesty Kamehameha III 1845–46, at 101.

## CONCLUSION

Based on the foregoing, we conclude that summary judgment was erroneously granted to MLC, as there are genuine issues of material fact regarding the ownership of 'āpana 1 in 1892. First, there is conflicting evidence as to the relationship between Apaa and Momona, the determination of which would establish whether 'āpana 1 could have been inherited by someone other than Momona. Second, there is evidence presenting Kekue as the record owner of 'āpana 1, which directly refutes MLC's claim that Momona received 'āpana 1 from Apaa, and that allows the purported heir of Kekue, in this case, Ke'eaumoku, to claim 'āpana 1.

Accordingly, we vacate the May 7, 2003 Order Granting Plaintiff's Summary Judgment Motion and the May 15, 2003 Final Judgment and remand to the circuit court for further proceedings consistent with this opinion.

---

**54.** Here is an example of the improper use of the letter "s" in the Hawaiian language. *Supra* note 35.